(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KIMBROUGH *v*. UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 06–6330.   Argued October 2, 2007—Decided December 10, 2007

Under the statute criminalizing the manufacture and distribution of cocaine, 21 U. S. C. §841, and the relevant Federal Sentencing Guidelines, a drug trafficker dealing in crack cocaine is subject to the same sentence as one dealing in 100 times more powder cocaine. Petitioner Kimbrough pleaded guilty to four offenses: conspiracy to distribute crack and powder; possession with intent to distribute more than 50 grams of crack; possession with intent to distribute powder; and possession of a firearm in furtherance of a drug-trafficking offense. Under the relevant statutes, Kimbrough's plea subjected him to a minimum prison term of 15 years and a maximum of life. The applicable advisory Guidelines range was 228 to 270 months, or 19 to 22.5 years. The District Court found, however, that a sentence in this range would have been greater than necessary to accomplish the purposes of sentencing set forth in 18 U. S. C. §3553(a). In making that determination, the court relied in part on its view that Kimbrough's case exemplified the "disproportionate and unjust effect that crack cocaine guidelines have in sentencing." The court noted that if Kimbrough had possessed only powder cocaine, his Guidelines range would have been far lower: 97 to 106 months. Concluding that the statutory minimum sentence was long enough to accomplish §3553(a)'s objectives, the court sentenced Kimbrough to 15 years, or 180 months, in prison. The Fourth Circuit vacated the sentence, finding that a sentence outside the Guidelines range is *per se* unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder offenses.

*Held:*

1. Under *United States* v. *Booker*, 543 U. S. 220, the cocaine Guidelines, like all other Guidelines, are advisory only, and the Fourth Cir-

cuit erred in holding the crack/powder disparity effectively manda-
tory. A district judge must include the Guidelines range in the array
of factors warranting consideration, but the judge may determine
that, in the particular case, a within-Guidelines sentence is "greater
than necessary" to serve the objectives of sentencing, §3553(a). In
making that determination, the judge may consider the disparity be-
tween the Guidelines' treatment of crack and powder offenses. Pp. 5–
21.

    (a) Crack and powder cocaine have the same physiological and
psychotropic effects, but are handled very differently for sentencing
purposes. The relevant statutes and Guidelines employ a 100-to-1
ratio that yields sentences for crack offenses three to six times longer
than those for offenses involving equal amounts of powder. Thus, a
major supplier of powder may receive a shorter sentence than a low-
level dealer who buys powder and converts it to crack. Pp. 5–11.

    (1) The crack/powder disparity originated in the Anti-Drug
Abuse Act of 1986 (1986 Act), which created a two-tiered scheme of
five- and ten-year mandatory minimum sentences for drug manufac-
turing and distribution offenses. Congress apparently adopted the
100-to-1 ratio because it believed that crack, a relatively new drug in
1986, was significantly more dangerous than powder. Thus, the 1986
Act's five-year mandatory minimum applies to any defendant ac-
countable for 5 grams of crack or 500 grams of powder, and its ten-
year mandatory minimum applies to any defendant accountable for
50 grams of crack or 5,000 grams of powder. In developing Guide-
lines sentences for cocaine offenses, the Sentencing Commission em-
ployed the statute's weight-driven scheme, rather than its usual em-
pirical approach based on past sentencing practices. The statute
itself specifies only two quantities of each drug, but the Guidelines
used the 100-to-1 ratio to set sentences for a full range of drug quan-
tities. Pp. 6–8.

    (2) Based on additional research and experience with the 100-
to-1 ratio, the Commission later determined that the crack/powder
differential does not meet the objectives of the Sentencing Reform Act
and the 1986 Act. The Commission also found the disparity inconsis-
tent with the 1986 Act's goal of punishing major drug traffickers
more severely than low-level dealers, and furthermore observed that
the differential fosters a lack of confidence in the criminal justice sys-
tem because of a perception that it promotes an unwarranted diver-
gence based on race. Pp. 8–10.

    (3) The Commission has several times sought to achieve a re-
duction in the crack/powder ratio. Congress rejected a 1995 amend-
ment to the Guidelines that would have replaced the 100-to-1 ratio
with a 1-to-1 ratio, but directed the Commission to propose revision

of the ratio under the relevant statutes and Guidelines. Congress took no action after the Commission's 1997 and 2002 reports recommended changing the ratio. The Commission's 2007 report again urged Congress to amend the 1986 Act, but the Commission also adopted an ameliorating change in the Guidelines. The modest amendment, which became effective on November 1, 2007, yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder. The Commission thus noted that it is only a partial remedy to the problems generated by the crack/powder disparity. Pp. 10–11.

(b) The federal sentencing statute, as modified by *Booker*, requires a court to give respectful consideration to the Guidelines, but "permits the court to tailor the sentence in light of other [§3553(a)] concerns as well," 543 U. S., at 245–246. The Government contends that the Guidelines adopting the 100-to-1 ratio are an exception to this general freedom and offers three arguments in support of its position, each of which this Court rejects. Pp. 11–21.

(1) The Government argues that the 1986 Act itself prohibits the Commission and sentencing courts from disagreeing with the 100-to-1 ratio. This position lacks grounding in the statute, which, by its terms, mandates only maximum and minimum sentences: A person convicted of possession with intent to distribute 5 grams or more of crack must be sentenced to a minimum of 5 years and a maximum of 40. A person with 50 grams or more of crack must be sentenced to a minimum of 10 years and a maximum of life. The statute says nothing about appropriate sentences within these brackets, and this Court declines to read any implicit directive into the congressional silence. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 341. Drawing meaning from silence is particularly inappropriate here, because Congress knows how to direct sentencing practices in express terms. See, *e.g.,* 28 U. S. C. §994(h). This cautious reading of the 1986 Act draws force from *Neal* v. *United States*, 516 U. S. 284, which involved different methods of calculating lysergic acid diethylamide (LSD) weights: The method applicable in determining statutory minimum sentences combined the weight of the pure drug and its carrier medium, while the one controlling the calculation of Guidelines ranges presumed a lower weight for the carrier medium. This Court rejected the argument that the Guidelines and the statute should be interpreted consistently, with the Guidelines' presumptive-weight method controlling the mandatory minimum calculation. Were the Government's current position correct, the Guidelines involved in *Neal* would be in serious jeopardy. The same reasons alleged to justify reading into the 1986 Act an implicit command to the Commission and sentencing courts to apply the 100-

to-1 ratio to all crack quantities could be urged in support of an ar-
gument that the 1986 Act requires the Commission to include the full
weight of the carrier medium in calculating LSD weights. Yet *Neal*
never questioned the Guidelines' validity, and in fact endorsed the
Commission's freedom to adopt a new method. If the 1986 Act does
not require the Commission to adhere to the Act's method for deter-
mining LSD weights, it does not require the Commission—or, after
*Booker*, sentencing courts—to adhere to the 100-to-1 ratio for crack
quantities other than those triggering the statutory mandatory mini-
mum sentences. Pp. 13–16.

(2) The Government also argues that Congress made clear, in
disapproving the Commission's 1995 proposed Guidelines amend-
ment, that the 1986 Act required the Commission and courts to re-
spect the 100-to-1 ratio. But nothing in Congress' 1995 action sug-
gested that crack sentences must exceed powder sentences by a ratio
of 100 to 1. To the contrary, Congress required the Commission to
recommend a revision of the ratio. The Government argues that, by
calling for recommendations to change both the statute and the
Guidelines, Congress meant to bar any Guidelines alteration in ad-
vance of congressional action. But the more likely reading is that
Congress sought proposals to amend both the statute and the Guide-
lines because the Commission's criticisms of the 100-to-1 ratio con-
cerned the exorbitance of the crack/powder disparity in both contexts.
Moreover, as a result of the 2007 amendment, which Congress did
not disapprove or modify, the Guidelines now deviate from the stat-
ute's 100-to-1 ratio, advancing a ratio that varies (at different offense
levels) between 25 to 1 and 80 to 1. Pp. 16–18.

(3) Finally, the Government argues that if district courts are
free to deviate from the Guidelines based on disagreements with the
crack/powder ratio, "unwarranted sentence disparities," 18 U. S. C.
§3553(a)(6), will ensue. The Government claims that, because sen-
tencing courts remain bound by the 1986 Act's mandatory minimum
sentences, deviations from the 100-to-1 ratio could result in sentenc-
ing "cliffs" around quantities triggering the mandatory minimums.
For example, a district court could grant a sizable downward vari-
ance to a defendant convicted of distributing 49 grams of crack, but
would be required by the statutory minimum to impose a much
higher sentence for only 1 additional gram. The LSD Guidelines ap-
proved in *Neal,* however, create a similar risk of sentencing "cliffs."
The Government also maintains that, if district courts are permitted
to vary from the Guidelines based on their disagreement with the
crack/powder disparity, defendants will receive markedly different
sentences depending on the particular judge drawn for sentencing.
While uniformity remains an important sentencing goal, *Booker* rec-

ognized that some departures from uniformity were a necessary cost of the remedy that decision adopted. And as to crack sentences in particular, possible variations among district courts are constrained by the 1986 Act's mandatory minimums. Moreover, to the extent that the Government correctly identifies risks of "unwarranted sentence disparities" within the meaning of §3353(a)(6), the proper solution is for district courts to take account of sentencing practices in other courts and the "cliffs" resulting from the statutory mandatory minimum sentences and weigh these disparities against the other §3553(a) factors and any unwarranted disparities created by the crack/powder ratio itself. Pp. 18–20.

(c) *Booker* rendered the Sentencing Guidelines advisory, 543 U. S., at 245, but preserved a key role for the Sentencing Commission. In the ordinary case, the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve §3553(a)'s objectives." *Rita* v. *United States*, 551 U. S. \_\_\_, \_\_\_ (slip op., at 11). The sentencing judge, on the other hand, is "in a superior position to find facts and judge their import under §3553(a) in each particular case." *Gall* v. *United States*, *ante*, at 13 (internal quotation marks omitted). In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply." *Rita*, 551 U. S., at \_\_\_ (slip op., at 12). On the other hand, while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range "fails properly to reflect §3553(a) considerations" even in a mine-run case. *Ibid.* The crack cocaine Guidelines, however, present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. Given the Commission's departure from its empirical approach in formulating the crack Guidelines and its subsequent criticism of the crack/powder disparity, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve §3553(a)'s purposes, even in a mine-run case. Pp. 20–21.

2. The 180-month sentence imposed on Kimbrough should survive appellate inspection. The District Court began by properly calculating and considering the advisory Guidelines range. It then addressed the relevant §3553(a) factors, including the Sentencing Commission's reports criticizing the 100-to-1 ratio. Finally, the court did not purport to establish a ratio of its own, but appropriately framed its final

determination in line with §3553(a)'s overarching instruction to "impose a sentence sufficient, but not greater than necessary" to accomplish the sentencing goals advanced in §3553(a)(2). The court thus rested its sentence on the appropriate considerations and "committed no procedural error," *Gall, ante*, at 17. Kimbrough's sentence was 4.5 years below the bottom of the Guidelines range. But in determining that 15 years was the appropriate prison term, the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with §3553(a). Giving due respect to the District Court's reasoned appraisal, a reviewing court could not rationally conclude that the 4.5-year sentence reduction Kimbrough received qualified as an abuse of discretion. Pp. 21–23.

174 Fed. Appx. 798, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, SOUTER, and BREYER, JJ., joined. SCALIA, J., filed a concurring opinion. THOMAS, J., and ALITO, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 06–6330

───────────

## DERRICK KIMBROUGH, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[December 10, 2007]

JUSTICE GINSBURG delivered the opinion of the Court.

This Court's remedial opinion in *United States* v. *Booker*, 543 U. S. 220, 244 (2005), instructed district courts to read the United States Sentencing Guidelines as "effectively advisory," *id.*, at 245. In accord with 18 U. S. C. §3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence. *Booker* further instructed that "reasonableness" is the standard controlling appellate review of the sentences district courts impose.

Under the statute criminalizing the manufacture and distribution of crack cocaine, 21 U. S. C. §841, and the relevant Guidelines prescription, §2D1.1, a drug trafficker dealing in crack cocaine is subject to the same sentence as one dealing in 100 times more powder cocaine. The question here presented is whether, as the Court of Appeals held in this case, "a sentence . . . outside the guidelines range is per se unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder cocaine offenses." 174 Fed. Appx. 798, 799 (CA4

2006) *(per curiam).* We hold that, under *Booker*, the co-
caine Guidelines, like all other Guidelines, are advisory
only, and that the Court of Appeals erred in holding the
crack/powder disparity effectively mandatory. A district
judge must include the Guidelines range in the array of
factors warranting consideration. The judge may deter-
mine, however, that, in the particular case, a within-
Guidelines sentence is "greater than necessary" to serve
the objectives of sentencing. 18 U. S. C. §3553(a) (2000 ed.
and Supp. V). In making that determination, the judge
may consider the disparity between the Guidelines' treat-
ment of crack and powder cocaine offenses.

## I

In September 2004, petitioner Derrick Kimbrough was
indicted in the United States District Court for the East-
ern District of Virginia and charged with four offenses:
conspiracy to distribute crack and powder cocaine; posses-
sion with intent to distribute more than 50 grams of crack
cocaine; possession with intent to distribute powder co-
caine; and possession of a firearm in furtherance of a drug-
trafficking offense. Kimbrough pleaded guilty to all four
charges.

Under the relevant statutes, Kimbrough's plea subjected
him to an aggregate sentence of 15 years to life in prison:
10 years to life for the three drug offenses, plus a consecu-
tive term of 5 years to life for the firearm offense.[1] In

_____

[1] The statutory range for possession with intent to distribute more
than 50 grams of crack is ten years to life. See 21 U. S. C.
§841(b)(1)(A)(iii) (2000 ed. and Supp. V). The same range applies to the
conspiracy offense. See §846 (2000 ed.). The statutory range for
possession with intent to distribute powder cocaine is 0 to 20 years.
See §841(b)(1)(C) (Supp. V). Finally, the statutory range for possession
of a firearm in furtherance of a drug-trafficking offense is five years to
life. See 18 U. S. C. §924(c)(1)(A)(i). The sentences for the three drug
crimes may run concurrently, see §3584(a), but the sentence for the
firearm offense must be consecutive, see §924(c)(1)(A).

order to determine the appropriate sentence within this statutory range, the District Court first calculated Kimbrough's sentence under the advisory Sentencing Guidelines.[2]  Kimbrough's guilty plea acknowledged that he was accountable for 56 grams of crack cocaine and 92.1 grams of powder cocaine.  This quantity of drugs yielded a base offense level of 32 for the three drug charges.  See United States Sentencing Commission, Guidelines Manual §2D1.1(c) (Nov. 2004) (USSG).  Finding that Kimbrough, by asserting sole culpability for the crime, had testified falsely at his codefendant's trial, the District Court increased his offense level to 34.  See §3C1.1.  In accord with the presentence report, the court determined that Kimbrough's criminal history category was II.  An offense level of 34 and a criminal history category of II yielded a Guidelines range of 168 to 210 months for the three drug charges.  See *id.*, ch. 5, pt. A, Sentencing Table.  The Guidelines sentence for the firearm offense was the statutory minimum, 60 months.  See USSG §2K2.4(b).  Kimbrough's final advisory Guidelines range was thus 228 to 270 months, or 19 to 22.5 years.

A sentence in this range, in the District Court's judgment, would have been "greater than necessary" to accomplish the purposes of sentencing set forth in 18 U. S. C. §3553(a). App. 72.  As required by §3553(a), the court took into account the "nature and circumstances" of the offense and Kimbrough's "history and characteristics."  *Id.*, at 72–73.  The court also commented that the case exemplified the "disproportionate and unjust effect that crack cocaine guidelines have in sentencing."  *Id.*, at 72.  In this regard, the court contrasted Kimbrough's Guidelines range of 228

———————

[2] Kimbrough was sentenced in April 2005, three months after our decision in *Booker* v. *United States*, 543 U. S. 220 (2005), rendered the Guidelines advisory.  The District Court employed the version of the Guidelines effective November 1, 2004.

to 270 months with the range that would have applied had he been accountable for an equivalent amount of powder cocaine: 97 to 106 months, inclusive of the 5-year mandatory minimum for the firearm charge, see USSG §2D1.1(c); *id.*, ch. 5, pt. A, Sentencing Table. Concluding that the statutory minimum sentence was "clearly long enough" to accomplish the objectives listed in §3553(a), the court sentenced Kimbrough to 15 years, or 180 months, in prison plus 5 years of supervised release. App. 74–75.[3]

In an unpublished *per curiam* opinion, the Fourth Circuit vacated the sentence. Under Circuit precedent, the Court of Appeals observed, a sentence "outside the guidelines range is per se unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder cocaine offenses." 174 Fed. Appx., at 799 (citing *United States* v. *Eura*, 440 F. 3d 625, 633–634 (CA4 2006)).

We granted certiorari, 551 U. S. ___ (2007), to determine whether the crack/powder disparity adopted in the United States Sentencing Guidelines has been rendered "advisory" by our decision in *Booker*.[4]

–––––––––––

[3] The prison sentence consisted of 120 months on each of the three drug counts, to be served concurrently, plus 60 months on the firearm count, to be served consecutively.

[4] This question has divided the Courts of Appeals. Compare *United States* v. *Pickett*, 475 F. 3d 1347, 1355–1356 (CADC 2007) (District Court erred when it concluded that it had no discretion to consider the crack/powder disparity in imposing a sentence), and *United States* v. *Gunter*, 462 F. 3d 237, 248–249 (CA3 2006) (same), with *United States* v. *Leatch*, 482 F. 3d 790, 791 (CA5 2007) *(per curiam)* (sentencing court may not impose a sentence outside the Guidelines range based on its disagreement with the crack/powder disparity), *United States* v. *Johnson*, 474 F. 3d 515, 522 (CA8 2007) (same), *United States* v. *Castillo*, 460 F. 3d 337, 361 (CA2 2006) (same), *United States* v. *Williams*, 456 F. 3d 1353, 1369 (CA11 2006) (same), *United States* v. *Miller*, 450 F. 3d 270, 275–276 (CA7 2006) (same), *United States* v. *Eura*, 440 F. 3d 625, 633–634 (CA4 2006) (same), and *United States* v. *Pho*, 433 F. 3d 53, 62–63 (CA1 2006) (same).

## II

We begin with some background on the different treatment of crack and powder cocaine under the federal sentencing laws. Crack and powder cocaine are two forms of the same drug. Powder cocaine, or cocaine hydrochloride, is generally inhaled through the nose; it may also be mixed with water and injected. See United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 5, 12 (Feb. 1995), available at http://www.ussc.gov/crack/exec.htm (hereinafter 1995 Report). (All Internet materials as visited Dec. 7, 2007, and included in Clerk of Court's case file.) Crack cocaine, a type of cocaine base, is formed by dissolving powder cocaine and baking soda in boiling water. *Id.*, at 14. The resulting solid is divided into single-dose "rocks" that users smoke. *Ibid.* The active ingredient in powder and crack cocaine is the same. *Id.*, at 9. The two forms of the drug also have the same physiological and psychotropic effects, but smoking crack cocaine allows the body to absorb the drug much faster than inhaling powder cocaine, and thus produces a shorter, more intense high. *Id.*, at 15–19.[5]

Although chemically similar, crack and powder cocaine are handled very differently for sentencing purposes. The 100-to-1 ratio yields sentences for crack offenses three to six times longer than those for powder offenses involving equal amounts of drugs. See United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy iv (May 2002), available at http://www.ussc.gov/r_congress/02crack/ 2002crackrpt.pdf (hereinafter 2002 Report).[6] This dispar-

-------------------

[5] Injecting powder cocaine produces effects similar to smoking crack cocaine, but very few powder users inject the drug. See 1995 Report 18.

[6] As explained in Part II–C, *infra*, the Sentencing Commission amended the Guidelines and reduced sentences for crack offenses

ity means that a major supplier of powder cocaine may receive a shorter sentence than a low-level dealer who buys powder from the supplier but then converts it to crack. See 1995 Report 193–194.

### A

The crack/powder disparity originated in the Anti-Drug Abuse Act of 1986 (1986 Act), 100 Stat. 3207. The 1986 Act created a two-tiered scheme of five- and ten-year mandatory minimum sentences for drug manufacturing and distribution offenses. Congress sought "to link the ten-year mandatory minimum trafficking prison term to major drug dealers and to link the five-year minimum term to serious traffickers." 1995 Report 119. The 1986 Act uses the weight of the drugs involved in the offense as the sole proxy to identify "major" and "serious" dealers. For example, any defendant responsible for 100 grams of heroin is subject to the five-year mandatory minimum, see 21 U. S. C. §841(b)(1)(B)(i) (2000 ed. and Supp V), and any defendant responsible for 1,000 grams of heroin is subject to the ten-year mandatory minimum, see §841(b)(1)(A)(i).

Crack cocaine was a relatively new drug when the 1986 Act was signed into law, but it was already a matter of great public concern: "Drug abuse in general, and crack cocaine in particular, had become in public opinion and in members' minds a problem of overwhelming dimensions." 1995 Report 121. Congress apparently believed that crack was significantly more dangerous than powder cocaine in that: (1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder, particularly for children who had been exposed by their mothers' drug use during pregnancy; (4)

—————

effective November 1, 2007. Except as noted, this opinion refers to the 2004 Guidelines in effect at the time of Kimbrough's sentencing.

crack use was especially prevalent among teenagers; and
(5) crack's potency and low cost were making it increas-
ingly popular. See 2002 Report 90.

Based on these assumptions, the 1986 Act adopted a
"100-to-1 ratio" that treated every gram of crack cocaine as
the equivalent of 100 grams of powder cocaine. The Act's
five-year mandatory minimum applies to any defendant
accountable for 5 grams of crack or 500 grams of powder,
21 U. S. C. §841(b)(1)(B)(ii), (iii); its ten-year mandatory
minimum applies to any defendant accountable for 50
grams of crack or 5,000 grams of powder, §841(b)(1)(A)(ii),
(iii).

While Congress was considering adoption of the 1986
Act, the Sentencing Commission was engaged in formulat-
ing the Sentencing Guidelines.[7] In the main, the Commis-
sion developed Guidelines sentences using an empirical
approach based on data about past sentencing practices,
including 10,000 presentence investigation reports. See
USSG §1A.1, intro. comment., pt. A, ¶3. The Commission
"modif[ied] and adjust[ed] past practice in the interests of
greater rationality, avoiding inconsistency, complying with
congressional instructions, and the like." *Rita* v. *United
States*, 551 U. S. ___, ___ (2007) (slip op., at 10).

The Commission did not use this empirical approach in
developing the Guidelines sentences for drug-trafficking
offenses. Instead, it employed the 1986 Act's weight-
driven scheme. The Guidelines use a drug quantity table
based on drug type and weight to set base offense levels
for drug trafficking offenses. See USSG §2D1.1(c). In
setting offense levels for crack and powder cocaine, the
Commission, in line with the 1986 Act, adopted the

––––––––––

[7] Congress created the Sentencing Commission and charged it with
promulgating the Guidelines in the Sentencing Reform Act of 1984, 98
Stat. 1987, 18 U. S. C. §3551 *et seq.* (2000 ed. and Supp. V), but the first
version of the Guidelines did not become operative until November
1987, see 1995 Report ii–iv.

100-to-1 ratio.  The statute itself specifies only two quanti-
ties of each drug, but the Guidelines "go further and set
sentences for the full range of possible drug quantities
using the same 100-to-1 quantity ratio."  1995 Report 1.
The Guidelines' drug quantity table sets base offense
levels ranging from 12, for offenses involving less than 250
milligrams of crack (or 25 grams of powder), to 38, for
offenses involving more than 1.5 kilograms of crack (or
150 kilograms of powder).  USSG §2D1.1(c).[8]

B

Although the Commission immediately used the
100-to-1 ratio to define base offense levels for all crack and
powder offenses, it later determined that the crack/powder
sentencing disparity is generally unwarranted.  Based on
additional research and experience with the 100-to-1 ratio,
the Commission concluded that the disparity "fails to meet
the sentencing objectives set forth by Congress in both the
Sentencing Reform Act and the 1986 Act."  2002 Re-
port 91.  In a series of reports, the Commission identified
three problems with the crack/powder disparity.

First, the Commission reported, the 100-to-1 ratio rested
on assumptions about "the relative harmfulness of the two
drugs and the relative prevalence of certain harmful con-
duct associated with their use and distribution that more
recent research and data no longer support."  *Ibid.;* see
United States Sentencing Commission, Report to Con-
gress: Cocaine and Federal Sentencing Policy 8 (May
2007),    available    at    http://www.ussc.gov/r_congress/
cocaine2007.pdf (hereinafter 2007 Report) (ratio Congress
embedded in the statute far "overstate[s]" both "the rela-
tive harmfulness" of crack cocaine, and the "seriousness of

---

[8]An offense level of 12 results in a Guidelines range of 10 to 16
months for a first-time offender; an offense level of 38 results in a range
of 235 to 293 months for the same offender.  See USSG ch. 5, pt. A,
Sentencing Table.

most crack cocaine offenses"). For example, the Commission found that crack is associated with "significantly less trafficking-related violence . . . than previously assumed." 2002 Report 100. It also observed that "the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure." *Id.*, at 94. The Commission furthermore noted that "the epidemic of crack cocaine use by youth never materialized to the extent feared." *Id.*, at 96.

Second, the Commission concluded that the crack/powder disparity is inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low-level dealers. Drug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers. See 1995 Report 66–67. But the 100-to-1 ratio can lead to the "anomalous" result that "retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." *Id.*, at 174.

Finally, the Commission stated that the crack/powder sentencing differential "fosters disrespect for and lack of confidence in the criminal justice system" because of a "widely-held perception" that it "promotes unwarranted disparity based on race." 2002 Report 103. Approximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed "primarily upon black offenders." *Ibid.*

Despite these observations, the Commission's most recent reports do not urge identical treatment of crack and powder cocaine. In the Commission's view, "some differential in the quantity-based penalties" for the two drugs is warranted, *id.*, at 102, because crack is more addictive than powder, crack offenses are more likely to involve weapons or bodily injury, and crack distribution is associ-

ated with higher levels of crime, see *id.*, at 93–94, 101–102. But the 100-to-1 crack/powder ratio, the Commission concluded, significantly overstates the differences between the two forms of the drug. Accordingly, the Commission recommended that the ratio be "substantially" reduced. *Id.*, at viii.

C

The Commission has several times sought to achieve a reduction in the crack/powder ratio. In 1995, it proposed amendments to the Guidelines that would have replaced the 100-to-1 ratio with a 1-to-1 ratio. Complementing that change, the Commission would have installed special enhancements for trafficking offenses involving weapons or bodily injury. See Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25075–25077 (1995). Congress, acting pursuant to 28 U. S. C. §994(p),[9] rejected the amendments. See Pub. L. 104–38, §1, 109 Stat. 334. Simultaneously, however, Congress directed the Commission to "propose revision of the drug quantity ratio of crack cocaine to powder cocaine under the relevant statutes and guidelines." §2(a)(2), *id.*, at 335.

In response to this directive, the Commission issued reports in 1997 and 2002 recommending that Congress change the 100-to-1 ratio prescribed in the 1986 Act. The 1997 Report proposed a 5-to-1 ratio. See United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 2 (Apr. 1997), http://www.ussc.gov/r_congress/newcrack.pdf. The 2002 Report recommended lowering the ratio "at least" to 20 to 1. 2002 Report viii. Neither proposal prompted congressional action.

The Commission's most recent report, issued in 2007,

———————

[9] Subsection 994(p) requires the Commission to submit Guidelines amendments to Congress and provides that such amendments become effective unless "modified or disapproved by Act of Congress."

again urged Congress to amend the 1986 Act to reduce the 100-to-1 ratio.  This time, however, the Commission did not simply await congressional action.  Instead, the Commission adopted an ameliorating change in the Guidelines.  See 2007 Report 9.  The alteration, which became effective on November 1, 2007, reduces the base offense level associated with each quantity of crack by two levels.  See Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571–28572 (2007).[10]  This modest amendment yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder.  See *ibid.*[11]  Describing the amendment as "only . . . a partial remedy" for the problems generated by the crack/powder disparity, the Commission noted that "[a]ny comprehensive solution requires appropriate legislative action by Congress."  2007 Report 10.

### III

With this history of the crack/powder sentencing ratio in mind, we next consider the status of the Guidelines tied to the ratio after our decision in *United States* v. *Booker*, 543 U. S. 220 (2005).  In *Booker*, the Court held that the man-

———————

[10] The amended Guidelines still produce sentencing ranges keyed to the mandatory minimums in the 1986 Act.  Under the pre-2007 Guidelines, the 5- and 50-gram quantities that trigger the statutory minimums produced sentencing ranges that slightly *exceeded* those statutory minimums.  Under the amended Guidelines, in contrast, the 5- and 50-gram quantities produce "base offense levels corresponding to guideline ranges that *include* the statutory mandatory minimum penalties."  2007 Report 9.

[11] The Commission has not yet determined whether the amendment will be retroactive to cover defendants like Kimbrough.  Even under the amendment, however, Kimbrough's Guidelines range would be 195 to 218 months—well above the 180-month sentence imposed by the District Court.  See Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571–28572 (2007); USSG ch. 5, pt. A, Sentencing Table.

datory Sentencing Guidelines system violated the Sixth
Amendment. See *id.*, at 226–227. The *Booker* remedial
opinion determined that the appropriate cure was to sever
and excise the provision of the statute that rendered the
Guidelines mandatory, 18 U. S. C. §3553(b)(1) (2000 ed.,
Supp. IV).[12] This modification of the federal sentencing
statute, we explained, "makes the Guidelines effectively
advisory." 543 U. S., at 245.

The statute, as modified by *Booker*, contains an over-
arching provision instructing district courts to "impose a
sentence sufficient, but not greater than necessary" to
accomplish the goals of sentencing, including "to reflect
the seriousness of the offense," "to promote respect for the
law," "to provide just punishment for the offense," "to
afford adequate deterrence to criminal conduct," and "to
protect the public from further crimes of the defendant."
18 U. S. C. §3553(a) (2000 ed. and Supp. V). The statute
further provides that, in determining the appropriate
sentence, the court should consider a number of factors,
including "the nature and circumstances of the offense,"
"the history and characteristics of the defendant," "the
sentencing range established" by the Guidelines, "any
pertinent policy statement" issued by the Sentencing
Commission pursuant to its statutory authority, and "the
need to avoid unwarranted sentence disparities among
defendants with similar records who have been found
guilty of similar conduct." *Ibid.* In sum, while the statute
still requires a court to give respectful consideration to the
Guidelines, see *Gall* v. *United States*, *ante*, at 7, 11, *Booker*
"permits the court to tailor the sentence in light of other
statutory concerns as well," 543 U. S., at 245–246.

——————
[12] The remedial opinion also severed and excised the provision of the
statute requiring *de novo* review of departures from the Guidelines, 18
U. S. C. §3742(e), because that provision depended on the Guidelines'
mandatory status. *Booker*, 543 U. S., at 245.

The Government acknowledges that the Guidelines "are now advisory" and that, as a general matter, "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Brief for United States 16; cf. *Rita* v. *United States*, 551 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 12) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations"). But the Government contends that the Guidelines adopting the 100-to-1 ratio are an exception to the "general freedom that sentencing courts have to apply the [§3553(a)] factors." Brief for United States 16. That is so, according to the Government, because the ratio is a "specific policy determinatio[n] that Congress has directed sentencing courts to observe." *Id.*, at 25. The Government offers three arguments in support of this position. We consider each in turn.

A

As its first and most heavily pressed argument, the Government urges that the 1986 Act itself prohibits the Sentencing Commission and sentencing courts from disagreeing with the 100-to-1 ratio.[13] The Government acknowledges that the "Congress did not *expressly* direct the Sentencing Commission to incorporate the 100:1 ratio in the Guidelines." Brief for United States 33 (brackets and internal quotation marks omitted). Nevertheless, it asserts that the Act "[i]mplicit[ly]" requires the Commission and sentencing courts to apply the 100-to-1 ratio. *Id.*, at 32. Any deviation, the Government urges, would be "logi-

_____

[13] The Government concedes that a district court may vary from the 100-to-1 ratio if it does so "based on the individualized circumstance[s]" of a particular case. Brief for United States 45. But the Government maintains that the 100-to-1 ratio is binding in the sense that a court may not give any weight to its own view that the ratio itself is inconsistent with the §3553(a) factors.

cally incoherent" when combined with mandatory minimum sentences based on the 100-to-1 ratio. *Id.*, at 33.

This argument encounters a formidable obstacle: It lacks grounding in the text of the 1986 Act. The statute, by its terms, mandates only maximum and minimum sentences: A person convicted of possession with intent to distribute 5 grams or more of crack cocaine must be sentenced to a minimum of 5 years and the maximum term is 40 years. A person with 50 grams or more of crack cocaine must be sentenced to a minimum of 10 years and the maximum term is life. The statute says nothing about the appropriate sentences within these brackets, and we decline to read any implicit directive into that congressional silence. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . ."). Drawing meaning from silence is particularly inappropriate here, for Congress has shown that it knows how to direct sentencing practices in express terms. For example, Congress has specifically required the Sentencing Commission to set Guidelines sentences for serious recidivist offenders "at or near" the statutory maximum. 28 U. S. C. §994(h). See also §994(i) ("The Commission shall assure that the guidelines specify a sentence to a substantial term of imprisonment" for specified categories of offenders.).

Our cautious reading of the 1986 Act draws force from *Neal* v. *United States*, 516 U. S. 284 (1996). That case involved different methods of calculating lysergic acid diethylamide (LSD) weights, one applicable in determining statutory minimum sentences, the other controlling the calculation of Guidelines ranges. The 1986 Act sets mandatory minimum sentences based on the weight of "a mixture or substance containing a detectable amount" of LSD. 21 U. S. C. §841(b)(1)(A)(v), (B)(v). Prior to *Neal*, we had interpreted that language to include the weight of the

carrier medium (usually blotter paper) on which LSD is absorbed even though the carrier is usually far heavier than the LSD itself. See *Chapman* v. *United States*, 500 U. S. 453, 468 (1991). Until 1993, the Sentencing Commission had interpreted the relevant Guidelines in the same way. That year, however, the Commission changed its approach and "instructed courts to give each dose of LSD on a carrier medium a constructive or presumed weight of 0.4 milligrams." *Neal*, 516 U. S., at 287 (citing USSG §2D1.1(c), n. (H) (Nov. 1995)). The Commission's change significantly lowered the Guidelines range applicable to most LSD offenses, but defendants remained subject to higher statutory minimum sentences based on the combined weight of the pure drug and its carrier medium. The defendant in *Neal* argued that the revised Guidelines and the statute should be interpreted consistently and that the "presumptive-weight method of the Guidelines should also control the mandatory minimum calculation." 516 U. S., at 287. We rejected that argument, emphasizing that the Commission had not purported to interpret the statute and could not in any event overrule our decision in *Chapman*. See 516 U. S., at 293–295.

If the Government's current position were correct, then the Guidelines involved in *Neal* would be in serious jeopardy. We have just recounted the reasons alleged to justify reading into the 1986 Act an implicit command to the Commission and sentencing courts to apply the 100-to-1 ratio to all quantities of crack cocaine. Those same reasons could be urged in support of an argument that the 1986 Act requires the Commission to include the full weight of the carrier medium in calculating the weight of LSD for Guidelines purposes. Yet our opinion in *Neal* never questioned the validity of the altered Guidelines. To the contrary, we stated: "Entrusted within its sphere to make policy judgments, the Commission may

abandon its old methods in favor of what it has deemed a more desirable 'approach' to calculating LSD quantities." *Id.*, at 295.[14]  If the 1986 Act does not require the Commission to adhere to the Act's method for determining LSD weights, it does not require the Commission—or, after *Booker*, sentencing courts—to adhere to the 100-to-1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences.

B

In addition to the 1986 Act, the Government relies on Congress' disapproval of the Guidelines amendment that the Sentencing Commission proposed in 1995.  Congress "not only disapproved of the 1:1 ratio," the Government urges; it also made clear "that the 1986 Act required the Commission (and sentencing courts) to take drug quantities into account, and to do so in a manner that respects the 100:1 ratio."  Brief for United States 35.

It is true that Congress rejected the Commission's 1995 proposal to place a 1-to-1 ratio in the Guidelines, and that Congress also expressed the view that "the sentence imposed for trafficking in a quantity of crack cocaine should

_____

[14]At oral argument, the Government sought to distinguish *Neal* v. *United States*, 516 U. S. 284 (1996), on the ground that the validity of the amended Guidelines was not before us in that case.  See Tr. of Oral Arg. 25.  That is true, but only because the Government did not challenge the amendment.  In fact, the Government's brief appeared to acknowledge that the Commission may legitimately deviate from the policies and methods embodied in the 1986 Act, even if the deviation produces some inconsistency.  See Brief for United States in *Neal* v. *United States*, O. T. 1995, No. 94–9088, p. 26 ("When the Commission's views about sentencing policy depart from those of Congress, it may become difficult to achieve entirely consistent sentencing, but that is a matter for Congress, not the courts, to address.").  Moreover, our opinion in *Neal* assumed that the amendment was a legitimate exercise of the Commission's authority.  See 516 U. S., at 294 (noting with apparent approval the Commission's position that "the Guidelines calculation is independent of the statutory calculation").

generally exceed the sentence imposed for trafficking in a like quantity of powder cocaine." Pub. L. 104–38, §2(a)(1)(A), 109 Stat. 334. But nothing in Congress' 1995 reaction to the Commission-proposed 1-to-1 ratio suggested that crack sentences must exceed powder sentences by a ratio of 100 to 1. To the contrary, Congress' 1995 action required the Commission to recommend a "revision of the drug quantity ratio of crack cocaine to powder cocaine." §2(a)(2), *id.*, at 335.

The Government emphasizes that Congress required the Commission to propose changes to the 100-to-1 ratio in *both* the 1986 Act and the Guidelines. This requirement, the Government contends, implicitly foreclosed any deviation from the 100-to-1 ratio in the Guidelines (or by sentencing courts) in the absence of a corresponding change in the statute. See Brief for United States 35–36. But it does not follow as the night follows the day that, by calling for recommendations to change the statute, Congress meant to bar any Guidelines alteration in advance of congressional action. The more likely reading is that Congress sought proposals to amend both the statute and the Guidelines because the Commission's criticisms of the 100-to-1 ratio, see Part II–B, *supra*, concerned the exorbitance of the crack/powder disparity in both contexts.

Moreover, as a result of the 2007 amendment, see *supra*, at 10–11, the Guidelines now advance a crack/powder ratio that varies (at different offense levels) between 25 to 1 and 80 to 1. See Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571–28572. Adopting the Government's analysis, the amended Guidelines would conflict with Congress' 1995 action, and with the 1986 Act, because the current Guidelines ratios deviate from the 100-to-1 statutory ratio. Congress, however, did not disapprove or modify the Commission-initiated 2007 amendment. Ordinarily, we resist reading congressional intent into congressional inaction. See *Bob Jones*

*Univ.* v. *United States*, 461 U. S. 574, 600 (1983). But in this case, Congress failed to act on a proposed amendment to the Guidelines in a high-profile area in which it had previously exercised its disapproval authority under 28 U. S. C. §994(p). If nothing else, this tacit acceptance of the 2007 amendment undermines the Government's position, which is itself based on implications drawn from congressional silence.

C

Finally, the Government argues that if district courts are free to deviate from the Guidelines based on disagreements with the crack/powder ratio, unwarranted disparities of two kinds will ensue. See 18 U. S. C. §3553(a)(6) (sentencing courts shall consider "the need to avoid unwarranted sentence disparities"). First, because sentencing courts remain bound by the mandatory minimum sentences prescribed in the 1986 Act, deviations from the 100-to-1 ratio could result in sentencing "cliffs" around quantities that trigger the mandatory minimums. Brief for United States 33 (internal quotation marks omitted). For example, a district court could grant a sizable downward variance to a defendant convicted of distributing 49 grams of crack but would be required by the statutory minimum to impose a much higher sentence on a defendant responsible for only 1 additional gram. Second, the Government maintains that, if district courts are permitted to vary from the Guidelines based on their disagreement with the crack/powder disparity, "defendants with identical real conduct will receive markedly different sentences, depending on nothing more than the particular judge drawn for sentencing." *Id.*, at 40.

Neither of these arguments persuades us to hold the crack/powder ratio untouchable by sentencing courts. As to the first, the LSD Guidelines we approved in *Neal* create a similar risk of sentencing "cliffs." An offender

who possesses LSD on a carrier medium weighing ten grams is subject to the ten-year mandatory minimum, see 21 U. S. C. §841(b)(1)(A)(v), but an offender whose carrier medium weighs slightly less may receive a considerably lower sentence based on the Guidelines' presumptive-weight methodology. Concerning the second disparity, it is unquestioned that uniformity remains an important goal of sentencing. As we explained in *Booker*, however, advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to "avoid excessive sentencing disparities." 543 U. S., at 264. These measures will not eliminate variations between district courts, but our opinion in *Booker* recognized that some departures from uniformity were a necessary cost of the remedy we adopted. See *id.*, at 263 ("We cannot and do not claim that use of a 'reasonableness' standard will provide the uniformity that Congress originally sought to secure [through mandatory Guidelines]."). And as to crack cocaine sentences in particular, we note a congressional control on disparities: possible variations among district courts are constrained by the mandatory minimums Congress prescribed in the 1986 Act.[15]

Moreover, to the extent that the Government correctly identifies risks of "unwarranted sentence disparities" within the meaning of 18 U. S. C. §3353(a)(6), the proper solution is not to treat the crack/powder ratio as mandatory. Section 3553(a)(6) directs *district courts* to consider the need to avoid unwarranted disparities—along with other §3553(a) factors—when imposing sentences. See *Gall*, *ante*, at 11, n. 6, 16. Under this instruction, district

_____

[15] The Sentencing Commission reports that roughly 70% of crack offenders are responsible for drug quantities that yield base offense levels at or only two levels above those that correspond to the statutory minimums. See 2007 Report 25.

courts must take account of sentencing practices in other courts and the "cliffs" resulting from the statutory mandatory minimum sentences. To reach an appropriate sentence, these disparities must be weighed against the other §3553(a) factors and any unwarranted disparity created by the crack/powder ratio itself.

### IV

While rendering the Sentencing Guidelines advisory, *United States* v. *Booker*, 543 U. S. 220, 245 (2005), we have nevertheless preserved a key role for the Sentencing Commission. As explained in *Rita* and *Gall*, district courts must treat the Guidelines as the "starting point and the initial benchmark," *Gall* v. *United States*, *ante*, at 11. Congress established the Commission to formulate and constantly refine national sentencing standards. See *Rita* v. *United States*, 551 U. S. \_\_\_, \_\_\_–\_\_\_ (2007) (slip op., at 9–11). Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *United States* v. *Pruitt*, 502 F. 3d 1154, 1171 (CA10 2007) (McConnell, J., concurring); see *supra*, at 7.

We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve §3553(a)'s objectives." *Rita*, 551 U. S., at \_\_\_ (slip op., at 11). The sentencing judge, on the other hand, has "greater familiarity with . . . the individual case and the individual defendant before him than the Commission or the appeals court." *Id.*, at \_\_\_ (slip op., at 18). He is therefore "in a superior position to find facts and judge their import under §3353(a)" in each particular case. *Gall*, *ante*, at 13 (internal quotation marks omitted). In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may

attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply." *Rita*, 551 U. S., at \_\_\_ (slip op., at 12). On the other hand, while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range "fails properly to reflect §3553(a) considerations" even in a mine-run case. *Ibid.* Cf. Tr. of Oral Arg. in *Gall* v. *United States*, O. T. 2007, No. 06-7949, pp. 38–39.

The crack cocaine Guidelines, however, present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of "empirical data and national experience." See *Pruitt*, 502 F. 3d, at 1171 (McConnell, J., concurring). Indeed, the Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions, *i.e.*, sentences for crack cocaine offenses "greater than necessary" in light of the purposes of sentencing set forth in §3553(a). See *supra*, at 8–9. Given all this, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve §3553(a)'s purposes, even in a mine-run case.

## V

Taking account of the foregoing discussion in appraising the District Court's disposition in this case, we conclude that the 180-month sentence imposed on Kimbrough should survive appellate inspection. The District Court began by properly calculating and considering the advi-

sory Guidelines range. It then addressed the relevant §3553(a) factors. First, the court considered "the nature and circumstances" of the crime, see 18 U. S. C. §3553(a)(1), which was an unremarkable drug-trafficking offense. App. 72–73 ("[T]his defendant and another defendant were caught sitting in a car with some crack cocaine and powder by two police officers—that's the sum and substance of it—[and they also had] a firearm."). Second, the court considered Kimbrough's "history and characteristics." §3553(a)(1). The court noted that Kimbrough had no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps, and that he had a steady history of employment.

Furthermore, the court alluded to the Sentencing Commission's reports criticizing the 100-to-1 ratio, cf. §3553(a)(5) (Supp. V), noting that the Commission "recognizes that crack cocaine has not caused the damage that the Justice Department alleges it has." App. 72. Comparing the Guidelines range to the range that would have applied if Kimbrough had possessed an equal amount of powder, the court suggested that the 100-to-1 ratio itself created an unwarranted disparity within the meaning of §3553(a). Finally, the court did not purport to establish a ratio of its own. Rather, it appropriately framed its final determination in line with §3553(a)'s overarching instruction to "impose a sentence sufficient, but not greater than necessary" to accomplish the sentencing goals advanced in §3553(a)(2). See *supra*, at 12. Concluding that "the crack cocaine guidelines [drove] the offense level to a point higher than is necessary to do justice in this case," App. 72, the District Court thus rested its sentence on the appropriate considerations and "committed no procedural error," *Gall* v. *United States*, *ante*, at 17.

The ultimate question in Kimbrough's case is "whether

the sentence was reasonable—*i.e.*, whether the District Judge abused his discretion in determining that the §3553(a) factors supported a sentence of [15 years] and justified a substantial deviation from the Guidelines range." *Ibid.* The sentence the District Court imposed on Kimbrough was 4.5 years below the bottom of the Guidelines range. But in determining that 15 years was the appropriate prison term, the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with §3553(a). See Part II–B, *supra*. Indeed, aside from its claim that the 100-to-1 ratio is mandatory, the Government did not attack the District Court's downward variance as unsupported by §3553(a). Giving due respect to the District Court's reasoned appraisal, a reviewing court could not rationally conclude that the 4.5-year sentence reduction Kimbrough received qualified as an abuse of discretion. See *Gall, ante*, at 20–21; *Rita* v. *United States*, 551 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 19–20).

\*    \*    \*

For the reasons stated, the judgment of the United States Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–6330

_____

### DERRICK KIMBROUGH, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[December 10, 2007]

JUSTICE SCALIA, concurring.

The Court says that "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect §3553(a) considerations' even in a mine-run case," but that this case "present[s] no occasion for elaborative discussion of this matter." *Ante,* at 21 (quoting *Rita* v. *United States*, 551 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 12)). I join the opinion only because I do not take this to be an unannounced abandonment of the following clear statements in our recent opinions:

> "[Our remedial opinion] requires a sentencing court to consider Guidelines ranges, . . . but it permits the court to tailor the sentence in light of other statutory concerns as well, see §3553(a).
>
> .　　　　.　　　　.　　　　.　　　　.
>
> "[W]ithout this provision—namely the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges'—the statute falls outside the scope of requirement.
>
> .　　　　.　　　　.　　　　.　　　　.
>
> "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take

them into account when sentencing." *United States* v. *Booker*, 543 U. S. 220, 245–246, 259, 264 (2005).

"Under the system described in JUSTICE BREYER's opinion for the Court in *Booker,* judges would no longer be tied to the sentencing range indicated in the Guidelines. But they would be obliged to 'take account of' that range along with the sentencing goals Congress enumerated in the SRA at 18 U. S. C. §3553(a)." *Cunningham* v. *California*, 549 U. S. ___, ___ (2007) (slip op., at 14).

"[The sentencing judge] may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, USSG §5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or perhaps because the case warrants a different sentence regardless. See Rule 32(f).

.          .          .          .          .

"A nonbinding appellate presumption that a Guidelines sentence is reasonable does not *require* the sentencing judge to impose that sentence. Still less does it *forbid* the sentencing judge from imposing a sentence higher than the Guidelines provide for the jury-determined facts standing alone. As far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence (higher than the statutory minimum or the bottom of the unenhanced Guidelines range) in the absence of the special facts (say, gun brandishing) which, in the view of the Sentencing Commission, would warrant a higher sentence within the statutorily permissible range." *Rita, supra,* at ___ (slip op., at 12, 14).

SCALIA, J., concurring

These statements mean that the district court is free to make its own reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines. If there is any thumb on the scales; if the Guidelines *must* be followed even where the district court's application of the §3553(a) factors is entirely reasonable; then the "advisory" Guidelines would, over a large expanse of their application, *entitle* the defendant to a lesser sentence *but for* the presence of certain additional facts found by judge rather than jury. This, as we said in *Booker,* would violate the Sixth Amendment.

# SUPREME COURT OF THE UNITED STATES

No. 06–6330

DERRICK KIMBROUGH, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[December 10, 2007]

JUSTICE THOMAS, dissenting.

I continue to disagree with the remedy fashioned in *United States* v. *Booker*, 543 U. S. 220, 258–265 (2005). The Court's post-*Booker* sentencing cases illustrate why the remedial majority in *Booker* was mistaken to craft a remedy far broader than necessary to correct constitutional error. The Court is now confronted with a host of questions about how to administer a sentencing scheme that has no basis in the statute. Because the Court's decisions in this area are necessarily grounded in policy considerations rather than law, I respectfully dissent.

In *Booker*, the Court held that the Federal Sentencing Guidelines violate the Sixth Amendment insofar as they permit a judge to make findings that raise a sentence beyond the level justified by the "'facts reflected in the jury verdict or admitted by the defendant.'" *Id.*, at 232 (quoting *Blakely* v. *Washington*, 542 U. S. 296, 303 (2004) (emphasis deleted)). In my view, this violation was more suitably remedied by requiring any such facts to be submitted to the jury. *Booker*, 543 U. S., at 323–325 (THOMAS, J., dissenting in part). That approach would have been consistent with our longstanding presumption of the severability of unconstitutional applications of statutory provisions. *Id.*, at 322–323 (THOMAS, J., dissenting in part). And it would have achieved compliance with

the Sixth Amendment while doing the least amount of violence to the mandatory sentencing regime that Congress enacted. *Id*., at 324–326 (THOMAS, J., dissenting in part). The Court, however, chose a more sweeping remedy. Despite acknowledging that under the mandatory Guidelines not "every sentence gives rise to a Sixth Amendment violation," the Court rendered the Guidelines advisory in their entirety and mandated appellate review of all sentences for "reasonableness." *Id.*, at 268. Because the Court's "solution fail[ed] to tailor the remedy to the wrong," I dissented from the remedial opinion. *Id.*, at 313.

As a result of the Court's remedial approach, we are now called upon to decide a multiplicity of questions that have no discernibly legal answers. Last Term, in *Rita* v. *United States*, 551 U. S. __ (2007), the Court held that a Court of Appeals may treat sentences within the properly calculated Guidelines range as presumptively reasonable. Today, in *Gall* v. *United States*, *ante*, p. __, the Court holds that a Court of Appeals may not require sentences that deviate substantially from the Guidelines range to be justified by extraordinary circumstances. And here the Court holds that sentencing courts are free to reject the Sentencing Guidelines' 100-to-1 crack-to-powder ratio.

These outcomes may be perfectly reasonable as a matter of policy, but they have no basis in law. Congress did not mandate a reasonableness standard of appellate review— that was a standard the remedial majority in *Booker* fashioned out of whole cloth. See 543 U. S., at 307–312 (SCALIA, J., dissenting in part). The Court must now give content to that standard, but in so doing it does not and cannot rely on any statutory language or congressional intent. We are asked here to determine whether, under the new advisory Guidelines regime, district courts may impose sentences based in part on their disagreement with a categorical policy judgment reflected in the Guidelines. But the Court's answer to that question necessarily de-

rives from something other than the statutory language or congressional intent because Congress, by making the Guidelines mandatory, quite clearly intended to bind district courts to the Sentencing Commission's categorical policy judgments. See 18 U. S. C. §3553(b) (2000 ed. and Supp. V) (excised by *Booker*). By rejecting this statutory approach, the *Booker* remedial majority has left the Court with no law to apply and forced it to assume the legislative role of devising a new sentencing scheme.

Although I joined JUSTICE SCALIA's dissent in *Rita* accepting the *Booker* remedial opinion as a matter of "statutory *stare decisis*," 551 U. S., at \_\_ (slip op., at 2), I am now convinced that there is no principled way to apply the *Booker* remedy—certainly not one based on the statute. Accordingly, I think it best to apply the statute as written, including 18 U. S. C. §3553(b), which makes the Guidelines mandatory. Cf. *Dickerson* v. *United States*, 530 U. S. 428, 465 (2000) (SCALIA, J., dissenting).

Applying the statute as written, it is clear that the District Court erred by departing below the mandatory Guidelines range. I would therefore affirm the judgment of the Court of Appeals vacating petitioner's sentence and remanding for resentencing.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–6330

_____

## DERRICK KIMBROUGH, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[December 10, 2007]

JUSTICE ALITO, dissenting.

For the reasons explained in my dissent in *Gall* v. *United States*, *ante*, p. \_\_\_, I would hold that, under the remedial decision in *United States* v. *Booker*, 543 U. S. 220, 258–265 (2005), a district judge is still required to give significant weight to the policy decisions embodied in the Guidelines. The *Booker* remedial decision, however, does not permit a court of appeals to treat the Guidelines' policy decisions as binding. I would not draw a distinction between the Guideline at issue here and other Guidelines. Accordingly, I would vacate the decision of the Court of Appeals and remand for reconsideration.