DAVIS, Circuit Judge,
concurring.
I concur fully in Judge Keenan’s opinion for the panel and offer these additional comments.
A.
The distinguished district judge was aghast that the now forty-year-old Tony Gregg would spend the rest of his life in federal prison for selling small amounts of crack cocaine over a period of several weeks out of a hotel room in a run-down section of Richmond. See infra n. 6. The judge uncovered (shortly after having imposed the mandatory life sentence) a seeming defect in the government’s information filed pursuant to 21 U.S.C. § 851 and elected to reconvene the sentencing proceeding and to impose, instead, a twenty-five year, within Guidelines sentence. As the panel opinion makes clear, we are constrained to undo the district court’s stab at achieving a more just sentence.
The record shows that Gregg was a classic “utility player” in America’s forty-year “war on drugs”: user, seller, “snitch.” A tenth-grade drop-out (after repeating the second grade and the seventh grade) with four half-siblings, he began to use illegal narcotics in his early teens. For a time, he lived in an abusive family environment; later, he moved between his mother, grandmother, and father, sometimes in Virginia, sometimes in Ohio. As a young man, he attempted suicide more than once (although he described the episodes as mere attempts to “get high”). Throughout his 20s and early 30s, he was in and out of jails and prisons on a regular basis, sometimes for assaultive behavior. He was convicted of illegal gun possession in 2001 and served a three-year federal prison sentence.
Later, once again released from incarceration and (according to his probation officer, who testified below) having adjusted reasonably well upon his return to free society, in consideration for unspecified monetary compensation, he became a highly-valued, highly-effective confidential informant for the Federal Bureau of Investigation’s Violent Crime Task Force in Richmond, on whose behalf he engaged in *218 half a dozen undercover drug transactions from mid-2008 through early 2009.
Sometime in early 2009, during his habitual association with drug users and dealers while working on behalf of the FBI to prosecute others involved in the drug trade, Gregg fell off the wagon and began to use and sell illegal narcotics again. As explained by Judge Keenan, he was unexpectedly accosted by Richmond robbery detectives (investigating crimes of which he was not suspected) while in possession of more than three grams of crack cocaine in March 2009; they seized the cocaine but did not arrest him. It was only weeks later, in May 2009, when Gregg himself became a target of an undercover drug sting by the FBI, that he was finally arrested and prosecuted in this case. No doubt believing that he might be allowed to “work off’ the March and May charges when he was interviewed by some of the very agents by whom he had recently been employed to make undercover drug purchases, Gregg promptly waived his Miranda rights and freely discussed his recent drug dealing activity.
Despite Gregg’s countless arrests starting as a juvenile at age 15 and his criminal history category of V, the pre-sentence report in this case recites: “The defendant does not qualify for a sentence enhancement under Career Offender, Criminal Livelihood, Armed Career Criminal or Repeat and Dangerous Sex Offender sections ... of the Sentencing Guidelines.”
Why, then, a life sentence, the kind of sentence sometimes imposed on convicted murderers? Apart from what his lawyer described as official animus arising from Gregg having “embarrassed” the FBI by dealing drugs while on the Bureau’s payroll, it appears that the federal prosecutors were told by Virginia state prosecutors that Gregg, who was for some period of time involved in the Crips gang (as the FBI full well knew at all relevant times), had “participated” in the murder of a high-volume Richmond drug dealer who was Gregg’s supplier. J.A. 338-39.[1] To be sure, so far as the record shows, no such evidence was ever presented in this case, either at trial or at sentencing. Furthermore, prior to trial, Gregg was offered a plea agreement for a twenty-year sentence; when he rejected the government’s offer, the government went all out for the life sentence found to be unjust by the district court. Of the government’s four non-law-enforcement witnesses at the one-day trial below, all four were women who were themselves, like Gregg, users and sellers of crack cocaine and heroin who worked with Gregg to sell crack cocaine.
Understandably, perhaps, to many, Gregg is not a sympathetic figure; they will think: he got what he deserved. To many others, perhaps, matters are not so clear. Indeed, many would say that Tony Gregg seems to be one more of the drug war’s “expendables.” See Nora V. Demleitner, “Collateral Damage": No Re-Entry for Drug Offenders, 47 Vill. L.Rev. 1027, 1050 (2002).
B.
This case presents familiar facts seen in courts across the country: a defendant addicted to narcotics selling narcotics in order to support his habit. Unfortunately for Gregg and countless other poorly-educated, drug-dependant offenders, current drug prosecution and sentencing policy mandates that he spend the rest of his life in prison. He is not alone: the United *219 States currently has the highest rate of incarceration in the world. The Pew Ctr. on the States, One in 100: Behind Bars in America 5 (2008), available at http://www. pewcenteronthestates.org/uploadedFiles/ 8015PCTS_Prison08_FINAL_2-l-l_ FORWEB.pdf. The United States also boasts the largest prison population in the world, with 2.3 million adult Americans behind bars.[2] Id.; see also Adam Liptak, More Than One in 100 Adults Are Now in Prison in U.S., N.Y. Times, Feb. 29, 2008, at A14. Further, Gregg, like most other drug offenders, has a drug dependence or abuse problem. Christopher J. Mumola & Jennifer C. Karberg, Bureau of Justice Statistics Special Report, U.S. Dep’t of Justice, Drug Use and Dependence, State and Federal Prisoners, 2004, at 7 tbl.5 (2006), available at http://bjs.ojp.usdoj.gov/ content/pub/ascii/dudsfp04.txt.
This staggering incarceration rate is traceable to the so-called “War on Drugs,” which began in 1971 and picked up steam in the mid-1980s, when Congress decided to get “tough” on drug-related crime by imposing lengthy mandatory minimum prison sentences for offenders convicted of participating in the illegal drug trade. See Barbara Vincent & Paul Hofer, Fed. Judicial Ctr., The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings 4 (1994), available at http://www.fjc.gov/public/pdf.nsfilookup/ eonmanmin.pdf/$File/conmanmin.pdf; Paige Harrison & Allen Beck, U.S. Dept, of Justice, Prisoners in 2002 1 (2003), available at http://bjs.ojp.usdoj.gov/index. cfm?ty=pbdetail&iid=921. To effectuate the change in drug policy, Congress passed the Anti-Drug Abuse Act of 1986, which allocated increased funding for drug enforcement and required mandatory minimum sentences for certain drug offenses. See U.S. Drug Enforcement Administration, 1985-1990, http://www.usdoj.gov/dea/ pubs/history/1985-1990.html. The Anti-Drug Abuse Act of 1988 added additional funds for enforcement and similarly increased penalties for drug violations. Id. Finally, the Federal Sentencing Guidelines became effective on November 1, 1987, coinciding with the passage of the federal Anti-Drug Abuse Acts of 1986 and 1988. These laws created an array of mandatory minimum sentences for drug offenses, stripping away the discretion that judges traditionally employed in sentencing drug offenders and shifting sentencing authority to prosecutors through their charging decisions. As a result, the proportion of drug offenders sentenced to prison swelled from 79% to 93% between 1988 and 2004, often for extraordinarily lengthy periods. Bureau of Justice Statistics, Compendium of Federal Justice Studies, 2001. (December 2006). In addition, the elimination of parole resulted in offenders serving much longer sentences than in the past. Marc Mauer & Ryan King, A 25 Year Quagmire: The War on Drugs and Its Impact on American Society 7 (2007).
The mass incarceration of drug offenders persists into the second decade of the twenty-first century despite the fact that research consistently demonstrates that the current approach to combating illegal drug use and drug trafficking is a failure. For example, one of the primary reasons for the war on drugs was to “create the proper incentives for the Department of Justice to direct its most intense focus on major traffickers and serious traffickers.” Id. at 14. In other words, the new drug laws were intended to target offenders who import, control and manage the distri *220 button of substantial quantities. However, the vast majority of drug offenders in the federal system are either street-level dealers, couriers, or low-level assistants. United States Sentencing Commission, Cocaine and Federal Sentencing Policy, May 2007, at 19. As Judge Sweet recently stated, lengthy incarcerations have “not been reserved for the worst offenders; the overall average sentence length for a federal drug offense ranges from 129 months for crack cocaine to 40.4 months for marijuana, with the majority of cocaine and crack offenders subject to five-and ten-year mandatory mínimums, despite the fact that the overwhelming majority of them, approximately 90% in 2005, committed no violence in connection with their drug crimes.” Robert Sweet, Will Money Talk?: The Case For a Comprehensive Cosh-Benefit Analysis of the War on Drugs, 20 Stan. L. & Pol’y Rev. 229, 230-31 (2009).
As the Federal Judicial Center concluded nearly twenty years ago, “the weight of the evidence clearly shows that enactment of mandatory penalties has either no demonstrable ... effects or short-term effects that rapidly waste away.” Barbara S. Vincent & Paul J. Hofer, Federal Judiciary Ctr., The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings 1 (1994) (quoting Professor Michael Tonry, Mandatory Penalties, in 16 Crime & Justice: A Review of Research, 243, 244 (1990)); see also Incarceration and Crime: A Complex Relationship, The Sentencing Project (2005); Don Stemen, Reconsidering Incarceration: New Directions for Reducing Crime, The Vera Institute for Justice (2007).
This over-incarceration is astronomically expensive. Taxpayers spend almost $70 billion a year on corrections and incarceration.[3] The Pew Ctr. on the States, One in 31: The Long Reach of American Corrections 2009 11 (2009); see also 74 Fed.Reg. 33,279 (July 10, 2009) (reporting that in 2008, the average annual cost of incarceration for federal inmates was $25,895). In contrast, drug treatment is more cost effective in controlling drug-related crime than the continued expansion of the prison system. For example, a RAND Corporation analysis concluded that spending the same funds on drug treatment would reduce drug-related crime 15 times as much as mandatory minimum sentencing. Jonathan Caulkins, C. Peter Rydell, Williams Schwabe, & James Chiesa, Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers’ Money? (RAND 1997). While drug treatment has been demonstrated to be more effective than incarceration without treatment, there has been a sharp decline in persons actually receiving drug treatment while incarcerated. See Christopher Mumola & Jennifer Karberg, Drug Use and Dependence, State and Federal Prisoners, 2001, Bureau of Justice Statistics (October 2006).
As has been well documented, these harsh policies are devastating to communities of color.[4] Despite the fact that whites *221 engage in drug offenses at a higher rate than blacks, blacks are incarcerated for drug offenses at a rate that is 10 times greater than their white counterparts. Jamie Fellner, Race, Drugs and Law Enforcement in the United States, 20 Stan. L. & Pol’y Rev. 257, 266-69 (2009) (citing U.S. Dep’t of Health & Human Services, Substance Abuse & Mental Health Services Admin., Results from the 2006 National Survey on Drug Use and Health: National Findings, at tbls. 1.34A, B (2006)). “On any given day, nearly one-third of black men in their twenties are under the supervision of the criminal justice system-either behind bars, on probation, or on parole.” Dorothy E. Roberts, The Social and Moral Cost of Mass Incarceration in African American Communities, 56 Stan. L.Rev. 1271, 1272 (2004); see also Carol A. Brook, Racial Disparity Under the Federal Sentencing Guidelines, 35 Litig., Fall 2008, at 1, 15. (“African-Americans alone make up almost 40 percent of the federal prison population, although they constitute only 13 percent of our country’s population.”).
This ballooning of the percentage of blacks incarcerated over the past 25 years directly corresponds with the disparate treatment of crack and powder cocaine. Marc Mauer, Racial Impact Statements as a Means of Reducing Unwarranted Sentencing Disparities, 5 Ohio St. J.Crim. L. 19, 22-29 (2007) (attributing disparities in rates of black imprisonment in part to federal crack cocaine penalties). Originally the United States Sentencing Commission adopted a 100:1 statutory ratio in creating the guidelines. See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy at v (Feb. 1995). For example, the Act imposed a five-year minimum sentence for persons convicted of trafficking 5 grams of cocaine base or 500 grams of cocaine powder and a ten-year minimum sentence for trafficking 50 grams of cocaine base or 5,000 grams of cocaine powder.[5] However, as observed by the Supreme Court, unlike the sentencing guidelines as a whole, the Commission “did not use [an] empirical approach in developing the Guidelines sentences for drug-trafficking offenses.” Kimbrough v. United States, 552 U.S. 85, 96, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). As Judge Myron Bright stated, “[t]his lack of an empirical approach to the creation of guidelines for crack cocaine counsels against according controlling, or even significant, weight to the guidelines.” United States v. Brewer, 624 F.3d 900, 912 (8th Cir.2010) (Judge Bright, concurring in part and dissenting in part) (citing United States v. Dorvee, 616 F.3d 174, 187-88 (2d Cir.2010) (holding that deference to the Guidelines depends on the thoroughness of the Commission’s analysis and the validity of its reasoning)). See also Global Commission on Drug Policy, War on Drugs at 5 (June 2011) (“There is no excuse ... for ignoring the evidence and experience accumulated since [the inception of the war on drugs]. Drug policies and strategies at all levels too often continue to be driven by ideological perspectives, or political convenience, and pay too little attention to the complexities of the drug market, drug use and drug addiction.”).
*222 To be sure, one of the fundamental flaws with mandatory minimum sentences is that the practice impedes district court judges from considering mitigating factors in sentencing in order to impose fair and just sentences. While it was thought that mandatory minimum sentences would reduce sentencing disparities, the opposite has come to fruition. Inconsistent application of mandatory mínimums has only exacerbated disparities because they transfer sentencing power from district court judges to prosecutors, “who may pre-set punishment through creative investigative and charging practices, producing troubling punishment differentials among offenders with similar culpability.” Erik Luna & Paul Cassell, Mandatory Minimalism, 32 Cardozo L.Rev. 1, 13 (2010).
Here, as in many other cases, the district court expressly noted its discontent with the statutory mandatory minimum sentence. This disapproval among distinguished jurists is not unusual. See, e.g., Anthony M. Kennedy, Speech at the American Bar Association Annual Meeting (Aug. 9, 2003) (available at http://www. supremecourt.gov/publicinfo/speeches/ viewspeeches.aspx?Filename=sp_08-09-03. html) (“By contrast to the guidelines, I can accept neither the necessity nor the wisdom of federal mandatory minimum sen-fences. In too many cases, mandatory minimum sentences are unwise and unjust.”); Debate, Mandatory Mínimums in Drug Sentencing: A Valuable Weapon in the War on Drugs or a Handcuff on Judicial Discretion?, 36 Am.Crim. L.Rev. 1279, 1284-85 (1999) (debate between Rep. Asa Hutchinson and U.S. District Court Judge Stanley Sporkin). See also John S. Martin, Jr., Why Mandatory Mínimums Make No Sense, 18 Notre Dame J.L. Ethics & Pub. Pol’y 311 (2004); Jack B. Weinstein, Every Day is a Good Day for a Judge to Lay Down his Professional Life for Justice, 32 Fordham Urb. L.J. 131 (2004); Gerard E. Lynch, Sentencing Eddie, 91 J.Crim. L. & Criminology 547 (2001). Even the U.S. drug czar, a position created by the Anti-Drug Abuse Act of 1988, admits the war on drugs is failing, stating that after 40 years and $1 trillion, “it has not been successful ... the concern about drugs and drug problems is, if anything, magnified, intensified.” Martha Mendoza, After JO Years and $1 Trillion, Drug Use Is Rampant and Violence Pervasive, Associated Press, May 13, 2010.
C.
I share the district judge’s dismay over the legally-mandated sentence he must impose in this case.[6] While the controlling *223 legal principles require us to order the reimposition of a sentence of life without parole in this case, the time has long passed when policymakers should come to acknowledge the nation’s failed drug policy and to act on that acknowledgement.
As a nation, we are smart enough to do better.

. In addition, because Gregg’s first trial ended in a hung jury, the government was required to try him a second time.

. The Pew Report figures do not take into account the number of juveniles currently in detention centers, which means that the total number of incarcerated Americans is higher still. Id.

. These costs are particularly significant to the federal system because of the increase in drug prosecutions brought in federal courts, presumably because of the potential for harsh mandatory mínimums. Bureau of Justice Statistics, Federal Criminal Case Processing, 2002 (January 2005); see also Heather West, William Sabol & Sarah Greenman, Prisoners in 2009, Bureau of Justice Statistics (2010) (In 1980, prisoners serving time for drug offenses constituted about one-quarter of the federal population while in 2009, the percentage had doubled.).

. Similarly, these policies have a disproportionate impact on female offenders, see Paige Harrison & Allen Beck, Prisoners in 2005, Bureau of Justice Statistics November 2006, and juveniles, see Patricia Soung, Social and Biological Constructions of Youth: Implications for Juvenile Justice and Racial Equity, 6 NW J.L. & Soc. Pol’y 428 (2011) (noting that *221 the War on Drugs is sweeping youth in unprecedented numbers into the criminal justice system); Ellen M. Weber, Bridging the Barriers: Public Health Strategies for Expanding Drug Treatment in Communities, 57 Rutgers L.Rev. 631, 644-48 (2005).

. In the Fair Sentencing Act of 2010, Congress lowered the 100-to-l sentencing disparity between crack cocaine and powder cocaine to a ratio of 18 to 1. Fair Sentencing Act of 2010, Pub.L. No. 111-220, 124 Stat. 2372 (2010).

. The district judge, a veteran of twenty-five years' service on the federal trial bench (and before that a highly-respected federal prosecutor) addressed the Appellant as follows at the original sentencing hearing in response to Gregg's protestation that a sentence of life without parole was unjust:
Well, for the record, Mr. Gregg, I will tell you that I agree with you wholeheartedly. I think a life sentence for what you have done in this case is ridiculous. It is a travesty. I don't have any discretion about it. The government, obviously you irritated them in some way and they reached back to these 1996 possession and possession with intentf,] to do this, which under the law they have the right to do. I don't agree with it, either. And I want the world and the record to be clear on that. This is just silly. But as I say, I don’t have any choice.
J.A. 311.
As discussed in text at pp. 30-31, the district court's sentiments are shared by a wide swath of trial and appellate federal judges. To take just one reported example, Sixth Circuit Judge Gilbert Merritt, sitting by designation in the First Circuit, expressed similar, long-standing frustrations in a case in which the government filed a § 851 information to require the district court to impose a twenty-year minimum sentence. Judge Merritt spoke for many federal judges when he wrote:
*223 I agree with the District Court that the prosecution’s decision to seek a mandatory sentence of 20 years under 21 U.S.C. § 851 passes all understanding. The District Court said: "I recognize you [AUSA] do this at the behest of your superiors. But I can't sit here today and impose this sentence without saying it's wrong, and you can take that message to whoever you think might listen.” The Judicial Conference of the United States for almost 20 years, and the Sentencing Commission for almost 10 years, have pleaded with the judiciary committees of Congress to do something about the serious injustices that these long, mandatory minimum sentences impose-to no avail. This is a 20-year sentence for a nonviolent crime by a defendant with a serious mental illness. His incarceration will cost the American taxpayers in today’s dollars somewhere between $600,000 and $1,000,000. With some carefully monitored rehabilitation treatment, it is possible that he could be released in just a few years. Like the District Judge, I think that the prosecution’s purely discretionary decision to ratchet up this sentence to 20 years is misguided and ought to be reconsidered when the judgment becomes final.
United States v. Gonzalez-Ramirez, 561 F.3d 22, 31 (1st Cir.), cert. denied, - U.S. -, 130 S.Ct. 524, 175 L.Ed.2d 370 (2009) (Merritt, J., concurring) (bracket in original).