NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0736n.06

No. 11-5551

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 10, 2012*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,  )
                           )    ON APPEAL FROM THE
        Plaintiff-Appellee, )    UNITED STATES DISTRICT
                           )    COURT FOR THE EASTERN
v.                         )    DISTRICT OF TENNESSEE
                           )
JOSHUA BARNES,             )    **OPINION**
                           )
        Defendant-Appellant. )

_____

**Before: SILER and WHITE, Circuit Judges; REEVES, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Joshua Barnes appeals his 100-month sentence imposed after he pleaded guilty of conspiracy to distribute and possess with the intent to distribute oxycodone and marijuana, 21 U.S.C. §§846, 841(a)(1), (b)(1)(C), & (b)(1)(D); attempt to possess with intent to distribute oxycodone, 21 U.S.C. §§846, 841(a)(1) & (b)(1)(C); 18 U.S.C. §2; and possession with intent to distribute marijuana. 21 U.S.C. §841(a)(1) & (b)(1)(D); 18 U.S.C. §2. We **AFFIRM**.

**I.**

A.      Factual Background

On June 1, 2010, a confidential informant ("CI") working with Tennessee law enforcement officials contacted George Joslin to inform him that the CI had a friend – in

_____

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

reality an undercover officer – who was trying to sell 500 stolen oxycodone tablets for $6,000. Joslin told the CI that he had a friend, later revealed as Defendant Barnes, who had expressed interest in obtaining oxycodone. Barnes had broken his leg in an auto accident and become addicted to oxycodone.

Joslin contacted Barnes, who, because he did not have the money to buy the pills, asked co-defendant Kylan Myers if he was interested and could finance the purchase. After learning the pills were 40-mg tablets, Myers agreed to purchase the pills for $5,000. Myers soon realized he was unable to procure the entire $5,000, so Barnes contacted Joslin to determine whether the CI would be willing to accept $4,000 and one pound of marijuana. The CI told Joslin that the new terms were acceptable.

The next day, June 2, Barnes arrived at Myers's home, where Myers gave Barnes a loaded firearm. They drove to Shelbyville, Tennessee, first to a mobile home where they met the CI and Joslin, and then to a convenience store, where they met the undercover officer, Agent Childers. Agent Childers showed Barnes and Myers one bottle of the pseudo-oxycodone pills, which were 80-mg tablets instead of the expected 40-mg tablets, and allowed them to count the pills. Myers handed the pills to Barnes, who counted them. Agent Childers testified that although he spoke mostly with Myers and Myers gave him the marijuana, Myers appeared to be looking to Barnes for approval. Agent Childers also testified that the two men seemed to be working together.

After Agent Childers gave the take-down signal, police arrested Barnes and Myers. Barnes did not contribute any of the money or marijuana used to purchase the oxycodone, and Myers admitted at trial that he was the "main player" in the transaction. Myers had

2

agreed to give Barnes a "couple of pills" for his help, but Myers alone was planning to sell the rest for profit.

B.    Procedural History

On June 8, 2010, the grand jury returned a five-count indictment against Barnes and Myers. Count One jointly charged Myers and Barnes with conspiring to distribute oxycodone and marijuana. 21 U.S.C. §§846 & 841(a)(1), (b)(1)(c) & (b)(1)(D). Count Two alleged that they attempted to possess oxycodone with intent to distribute. 21 U.S.C. §§846 & 841(a)(1), (b)(1)(c); 18 U.S.C. §2. Count Three charged them with possession of marijuana with intent to distribute. 21 U.S.C. §§841(a)(1), (b)(1)(D); 18 U.S.C. §2. Counts Four and Five charged Myers and Barnes respectively with possessing a firearm in furtherance of a drug-trafficking crime. 18 U.S.C. § 924(c). On September 1, 2010, the Magistrate Judge entered an order setting bond, with the condition that Barnes receive treatment through the Council for Alcohol and Drug Abuse Services ("CADAS"). Barnes successfully completed the program on October 15, 2010.

On January 25, 2011, Barnes informed the government that he would plead guilty to the drug charges. Myers pleaded guilty to Counts One and Four and agreed to cooperate with the government. Barnes contested his guilt on the firearm charge, and after a two-day trial during which Myers testified against Barnes, the jury acquitted Barnes of the gun charge.

Barnes's Presentence Investigation Report ("PSR") described the offense as involving 500 pills, at 80-mg per pill, for a total of 40 grams of oxycodone. The conversion ratio under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") for oxycodone to marijuana resulted in a starting offense level of 26. Applying a two-level increase for

3

possessing a gun and a three-level decrease for accepting responsibility, the ending offense level was 25, which, coupled with Barnes's criminal history category of V, resulted in a Guidelines range of 100 to 125 months' imprisonment.

Barnes filed a motion for a downward departure and a motion for a variance, raising a series of objections. The district court overruled Barnes's objections and sentenced him to 100 months' imprisonment for Counts 1 and 2 and 60 months' imprisonment for Count 3, to be served concurrently. Barnes timely appealed his sentence.

## II.

This court reviews sentences for reasonableness, which has both procedural and substantive components. *See Gall v. United States*, 552 U.S. 38, 46 (2007); *see also United States v.Reilly*, 662 F.3d 754, 757 (6th Cir. 2011). Barnes only challenges the procedural reasonableness of his sentence. A sentence is procedurally unreasonable "if the district court fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence." *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009). We employ an abuse-of-discretion standard of review for reasonableness, and within-Guidelines sentences raise a rebuttable presumption of reasonableness. *See United States v. Christman*, 607 F.3d 1110, 1117 (6th Cir. 2010).

## III.

Barnes moved for a downward departure pursuant to U.S.S.G. § 4A1.3(b)(1), which provides in relevant part, "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal

history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." The district court denied Barnes's motion. A district court's decision not to grant a downward departure is generally grounds to vacate a sentence only if the district court was not aware of, or did not understand, its discretion to grant the downward departure. *United States v. Johnson*, 553 F.3d 990, 999 (6th Cir. 2009) (citation and quotation marks omitted); *Reilly*, 662 F.3d at 759. Barnes argues the district court erred in two ways in rejecting his arguments involving his criminal history.

First, Barnes argues the district court erred in refusing to consider his post-offense rehabilitation efforts – specifically, his successful treatment through CADAS – in deciding whether to grant a departure. The district court explained that although Barnes's successful CADAS treatment was "admirable," and it could "take note of it," the treatment nevertheless "shouldn't factor in to the calculation of his criminal history, because it doesn't really fall within the category of history yet." Tr. at 38. Barnes argues that this statement shows that the district court failed to appreciate its authority to consider his CADAS treatment. *See United States v. Hairston*, 502 F.3d 378, 384 (6th Cir. 2007) (holding that district court can take post-offense rehabilitation into account in fashioning a sentence).

The district court's statement reflects the common-sense conclusion that Barnes's CADAS treatment was too recent to shed light on the likelihood that he would recidivate. The district court stated that it could "take note of" Barnes's treatment, but ultimately concluded, "it's been demonstrated to me by the proof Mr. Barnes is almost certain to recidivate." The district court understood that it could consider Barnes's post-offense rehabilitation.

5

Second, Barnes argues that the district court erred by focusing solely on the recidivism prong of §4A1.3(b)(1) and effectively ignoring his other ground for departure – namely, that category V over-represented the seriousness of his prior offenses, which were minor and mostly related to his inability to complete probation. Barnes highlights that when he asked the district court about the seriousness of the prior offenses, the district court responded, "in terms of being indicative of the likelihood to recidivate, I would classify them as serious." Barnes thus contends the district court misapplied the Guidelines because §4A1.3(b)(1) provides two distinct grounds on which to depart: if the criminal history category substantially over-represents the seriousness of the defendant's criminal history *or* if the criminal history category substantially over-represents the likelihood that the defendant will commit other crimes. Barnes contends the district court only seriously considered whether the criminal history category overstated his likelihood to commit other crimes.

Barnes's argument to the district court relied heavily on his rehabilitation, so the district court's emphasis on recidivism is understandable. Beyond this, Barnes points to no statements implying the district court did not understand its discretion to depart based on the non-severity of Barnes's prior criminal conduct. *See United States v. Santillana*, 540 F.3d 428, 431 ("[W]e presume that the district court understood its discretion, absent clear evidence to the contrary.") (citation omitted). As Barnes's counsel was listing the offenses and criminal history points, the district court repeatedly pointed out that for most of the offenses, Barnes did not receive any criminal history points, concluding, "[t]hey're [sic] just too many paradoxes in the argument." Tr. at 36-37. The paradox is that Barnes was arguing that category V over-represented his criminal history, but the majority of his offenses – 14

6

out of 20 – did not receive any criminal-history points. Barnes has not demonstrated that the district court did not understand or refused to exercise its discretion.

Accordingly, the district court did not commit procedural error in its determination that Barnes's category V did not substantially over-represent his criminal history or likelihood of recividism.

**IV.**

Barnes next contends the district court failed to adequately respond to certain non-frivolous arguments. A sentencing judge has an obligation to "set forth enough [of a statement of reasons] to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007) (citation omitted); *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011). A district court is not, however, required to conduct a point-by-point discussion, as long as the district court conducted a "meaningful sentencing hearing and truly consider[ed] the defendant's arguments." *United States v. Gunter*, 620 F.3d 642, 646 (6th Cir. 2010). The district court must adequately "explain[] the basis for rejecting" a non-frivolous argument. *United States v. Lalonde*, 509 F.3d 750, 769-70 (6th Cir. 2007).

Barnes points to two non-frivolous arguments for which he asserts the district court did not adequately explain its conclusions. First is Barnes's argument involving the oxycodone conversion ratio. However, the district court engaged in a lengthy and exhaustive discussion of Amendment 657, the Amendment through which the Sentencing Commission altered the oxycodone conversion ratio, as well as the implications of the Supreme Court's

decision in *Kimbrough*. *Kimbrough v. United States*, 552 U.S. 85 (2007). The thrust of Barnes's argument was that Amendment 657 is arbitrary and capricious, specifically its use of 10-mg as the baseline and insofar as it did not treat other narcotic analgesics similarly. After recognizing that its discretion was "extraordinarily broad," Tr. at 41, the district court rejected Barnes's argument:

> I do find that the guidelines as they relate to Oxycodone are based upon a rational analysis of the appropriate factors, scientific, sociological, and otherwise, and, therefore, the Court can be skeptical of them but in this case finds that they are at least rationally based, and, quite honestly, based upon all of the evidence in front of me probably, probably as reflective of the balancing act between scientific and sociological evidence that goes into these balances as any other drug quantity, any other drug quantity analysis incorporated in the guidelines, so -- that's my ruling on that.

*Id.* at 93. When Barnes asked for more specific findings on this issue, the district court explained that it did not "accept the argument that all of the drug quantity, all of the drug quantities standards within the guidelines are arbitrary and capricious." *Id.* at 97. Whether the district court abused its discretion in ruling on the policy underlying Amendment 657 is a separate question, discussed in more detail below, but the district court obviously considered the argument and explained its basis for rejecting it.

The second non-frivolous argument Barnes submits the district court did not consider or adequately explain is his argument that his case is "outside the heartland" of cases the Guidelines are intended to cover. Barnes asserts he and Myers were marijuana dealers with no inclination to deal in oxycodone until the reverse-sting operation involved here, and that they expected the oxycodone tablets to be 40-mg instead of 80-mg. From the outset, the district court pointed out that this argument was a sentencing entrapment argument, later

8

reiterating that it was "having trouble understanding why this isn't an entrapment argument." *Id.* at 71. The district court explained that Barnes and Myers were marijuana dealers and that, therefore, "they had the propensity to commit the crime before the state ever introduced its reverse sting operation into this." *Id.* at 85. Barnes's counsel conceded that sentencing entrapment requires government misconduct. The transcript shows that the district court viewed Barnes's "outside the heartland" argument as a sentencing entrapment argument; that no government misconduct was involved; and that Barnes had the propensity to engage in drug deals. Revealingly, Barnes does not argue that the district court was incorrect or otherwise challenge the underlying bases for the district court's ruling. Furthermore, as Barnes concedes, the difference between 40-mg pills and 80-mg pills would not change Barnes's base-offense level. *Id.* at 8-10.

The district court "conducted a meaningful sentencing hearing and truly consider[ed] the defendant's arguments," *Gunter*, 620 F.3d at 646, but disagreed and adequately explained the basis for its disagreement. The district court did not commit procedural error on this ground.

## V.

Barnes next contends the district court presumed the reasonableness of the Guidelines conversion ratio for oxycodone and, relatedly, failed to appreciate its authority to reject the ratio based on a policy disagreement. *See generally Spears v. United States*, 555 U.S. 261, 265-66 (2009) ("[D]istrict courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."). It is well-settled that the Guidelines are not mandatory. *United States v. Booker*, 543 U.S. 220, 266-67

(2005).  Moreover, a district court may reject the Guidelines based solely on a policy disagreement, even disagreements not involving the crack-to-powder cocaine ratio.  *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007); *United States v. Herrera-Zuniga*, 571 F.3d 568, 584 (6th Cir. 2009).  A district court commits procedural error by failing to recognize its authority to vary from the Guidelines based only on a policy disagreement.  *United States v. Guest*, 564 F.3d 777, 779-80 (6th Cir. 2009); *United States v. Johnson*, 553 F.3d 990, 992 (6th Cir. 2009).

Amendment 657 changed the oxycodone-to-marijuana conversion ratio, *United States v. Nassar*, 373 F. App'x 564, 565 (6th Cir. 2010), and, according to Barnes, resulted in an unfair and disproportionate sentencing scheme.  Barnes emphasizes that the marijuana-conversion ratio for other pharmacologically similar drugs was not similarly modified to be based on the actual amount of the drug involved and that the Sentencing Commission's use of 10-mg of oxycodone as the baseline was arbitrary.[1]

---

[1]Oxycodone is classified as a narcotic analgesic, along with several other controlled substances, such as morphine, codeine, and hydrocodone.  Since 1991, controlled substances are compared to marijuana in determining a sentencing range.  U.S.S.G. § 2D1.1 application n.10 (2010); *see also United States v. Lundy*, 366 F. App'x 590, 593 n.1 (6th Cir. 2010) (discussing conversion ratio).  Prior to Amendment 657 in 2003, oxycodone was treated similarly to other strong narcotic analgesics in terms of its conversion ratio to marijuana.  Amendment 657 changed this and sought to correct a disparity due to the amount of oxycodone contained in different formulations of pills, such as Percocet and Oxycontin.  Oxycontin contains a much higher amount of actual oxycodone than Percocet, but individuals selling Percocet before Amendment 657 were punished at the same level as people selling Oxycontin.  Amendment 657 changed the baseline to the amount of *actual* oxycodone in a pill instead of the total weight of the pill, thereby significantly increasing the penalty for pills with higher amounts of oxycodone.  Amendment 657 did not make such a change in other narcotic analgesics.  *See generally United States v. Ekasala*, 596 F.3d 74, 75 (1st Cir. 2010).  Amendment 657 also used 10-mg as the baseline.  *See also United States v. Muza*, 232 F. App'x 934 (11th Cir. 2007) (rejecting attempt to apply Amendment 657 to hydrocodone).

Barnes points to several statements that, in his view, demonstrate that the district court did not recognize its authority to vary from, and presumed the reasonableness of, the Guidelines' conversion ratio, including the following:

> You know, I'll be honest, I mean, I'm not sure that the Court is enough of either a chemist or, you know, a biologist or for that matter a sociologist to determine why the guidelines and really, as I say, I think it's the federal government as a whole either through, I guess, the Food and Drug administration or the Drug Enforcement Administration that come up with these, you know, classifications of drugs and, you know, in this context, the criminalization, the criminal punishment that should be applicable. The Court understands that it's based upon some sort of balancing, as I said before, between the beneficial affects [sic] to society or an individual if the drug is used properly versus the detrimental affects [sic]. I mean, that is what we got into with the whole crack versus powder cocaine thing. While I understood sort of the sociological arguments about that, I mean, how am I, how is a court, individual court here to second guess that sort of thing?

Tr. at 46. The district court made several similar statements expressing a general reluctance to question the Sentencing Commission's determination involving Amendment 657.

The district court engaged in a lengthy dialogue with Barnes's counsel about this issue, explaining that Barnes's argument would require every district court in every drug trafficking case to start from scratch and inquire into the sociological, chemical, biological, and policy bases for a particular drug-conversion ratio. The district court insisted at various points that it was not presuming that the conversion ratio was reasonable, *id.* at 56, 102, and turned the argument around by asking Barnes's counsel why some of the other drug-equivalency tables were not arbitrary and capricious:

> But by making that argument, aren't you then – why are the Hydrocodone guidelines based upon rational basis, why aren't they arbitrary and capricious as well? .... [Y]ou're doing the same thing you're telling me I can't do in the case because you are then assuming that the Hydrocodone guidelines must be the basis of empirical rational, you know, analysis.

11

*Id.* at 66. The district court concluded that the oxycodone-conversion ratio was "based upon a rational analysis of the appropriate factors, scientific, sociological, and otherwise," *id.* at 93, and that the "Sentencing Commission did engage in a reasoned analysis of the appropriateness of these particular sets of guidelines and drug quantities." *Id.* at 97.

The district court was obviously reluctant to accept Barnes's argument, but expressing reluctance is not tantamount to failing to consider the argument or to considering the oxycodone-conversion ratio sacrosanct. *See Brooks*, 628 F.3d at 800 ("[T]he fact that a district court may disagree with a Guideline for policy reasons and may reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees.") (emphasis added). The *Brooks* court explained that forcing a sentencing judge to "'delve into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline'" would result in "'unmanageable'" sentencing hearings. *Id.* (quoting *United States v. Aguilar-Huerta*, 576 F.3d 365, 367-68 (7th Cir. 2009)); *accord Eksala*, 596 F.3d at 75-76 ("As we held in rejecting a similar argument as to crack/powder disparity, the mere fact that a sentencing court has the discretion to disagree with the guidelines on policy grounds, does not mean that it is required to do so.").

So it is here. Barnes must show more than "mere conjecture that the district court may have felt constrained by the Guidelines." *Guest*, 564 F.3d at 781. The extensive back-and-forth indicates that the district court grappled with the issue and that it understood its

discretion.[2] *See, e.g., Nassar*, 373 F. App'x at 566 ("The extent of argument alone undermines the conclusion that the court felt itself bound by the Guidelines."). The Court noted that it "was not bound by what they do," Tr. at 48, and that it could be "skeptical" of the Guidelines. *Id.* at 93. The district court fully considered Barnes's argument, appreciated its discretion to reject Amendment 657, and chose not to disagree on policy grounds. Barnes's challenge fails on this basis, as well.

## VI.

Barnes's final argument is that the district court did not adequately consider the nature and circumstances of his offense under §3553(a) and relied on clearly erroneous facts in arriving at a sentence. A district court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing, paying specific attention to seven factors, including the nature and circumstances of the offense. 18 U.S.C. §3553(a); *Gall*, 552 at 49. A district court need not engage in a ritualistic incantation of the §3553(a) factors as long as its explanation permits a meaningful appellate review. *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008). "[A] court relies on clearly erroneous facts when the sentencing judge relies upon erroneous information and the information in question appears to have been an important factor in determining the sentence." *United States v. Cunningham,* 669 F.3d 723, 730 (6th Cir. 2012) (citation and quotation marks omitted).

---

[2]Although the district court never expressly stated that it agreed with the policy underlying Amendment 657, it did come close, asking Barnes's counsel why it would be inappropriate to "infer" that the 10-mg baseline reflected a reasoned judgment and stating that Amendment 657's attempt to establish proportionality was admirable.

Barnes's basic argument appears to be that once the district court considered his argument for a minor-role reduction in the context of his earlier motion for a downward departure, it refused to consider it again in its analysis of the §3553(a) factors, particularly the nature and circumstances of Barnes's offense. Earlier in the hearing, Barnes argued that he was entitled to a downward departure pursuant to U.S.S.G. §3B1.2 based on his role in the conspiracy, which he portrays as a facilitator or go-between.[3] The district court recognized that it would also have to consider Barnes's role again when it assessed the §3553(a) factors. Tr. at 27. After hearing testimony from Agent Childers, the district court rejected Barnes's §3B1.2 minor-role argument. Barnes cites no authority for the counterintuitive proposition that a district court cannot rely on its earlier findings and analysis involving a related issue when it considers the §3553(a) factors later in the sentencing hearing. Although it is true that Barnes was not to receive more than a few pills or sell any of the pills, Barnes solicited Myers's participation in the deal; the deal would not have occurred but for Barnes; Barnes was present and carrying a firearm at the deal; Barnes counted the pills; and, according to Agent Childers, Myers appeared to be looking to Barnes for approval during the transaction. The district court did not abuse its discretion on these facts.

Barnes's objection that the district court relied on clearly erroneous facts also misses the mark. Viewed in context, the district court did not rely on any facts involving additional conspiracies; instead, the district court was referencing Barnes's prior drug dealing in

[3]Barnes does not contest, at least explicitly, the district court's finding that he was not entitled to a §3B1.2 minor-role reduction.

14

marijuana to dispute Barnes's point that the two men did not have any predisposition to deal in oxycodone. The statements about other drug deals were simply a set of *potential* facts used as an illustration. Barnes also argued that the district court ignored Myers's testimony that he was the main player in the transaction. But finding certain testimony entitled to little weight is not tantamount to relying on clearly erroneous facts. The district court did not find Myers's statements dispositive of whether Barnes's role was minor. The district court's finding that Barnes was not a minor participant was based on, among other things, testimony that Barnes set up the drug deal, was present at the transaction, and that Myers appeared to look to Barnes for approval during the transaction. Barnes fails to articulate any facts upon which the district court actually relied that were clearly erroneous.

The district court considered the nature and circumstances of the offense and did not rely on clearly erroneous facts. Accordingly, Barnes's procedural reasonableness challenge fails.

## VII.

For the foregoing reasons, we AFFIRM Barnes's sentence.

15