[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15056
Non-Argument Calendar

_____

D.C. Docket No. 3:11-cr-00115-MMH-MCR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN L. BEUMEL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 21, 2013)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

After a guilty plea, Steven Beumel appeals his 360-month total sentence for one count of recklessly tampering with a consumer product resulting in death, in violation of 18 U.S.C. § 1365(a)(2); four counts of recklessly tampering with a consumer product resulting in serious bodily injury, in violation of 18 U.S.C. § 1365(a)(3); and five counts of acquiring fentanyl, a controlled substance, by deception and subterfuge, in violation of 21 U.S.C. § 843(a)(3).  After review, we affirm.

## I.  BACKGROUND FACTS

### A.    Beumel's Offense

From 2004 to 2010, Beumel worked as a licensed radiologic technician for Mayo Clinic's Interventional Radiology Department.  Beumel's duties included, among others, preparing patients for procedures, obtaining necessary supplies, reloading syringes, ensuring sterility within the procedure rooms, and, sometimes, emptying containers with used needles and syringes.  In performing his job, Beumel had access to syringes containing the narcotic fentanyl, a powerful, fast-acting, pain reliever.

In 2006, Beumel began stealing fentanyl from the Mayo Clinic by retrieving discarded syringes containing residual fentanyl, replacing the syringe needles, and injecting himself with the drug.  At some point, instead of (or in addition to)

obtaining discarded fentanyl from the trash, Beumel began taking unused fentanyl intended for patients undergoing various medical procedures.

Specifically, if fentanyl was needed during a medical procedure, a registered nurse would take a syringe, fill it with fentanyl from a vial, mark the syringe as containing fentanyl, and place the full syringe on a cart headed to the patient. Unbeknownst to the nurse, Beumel would take the fentanyl-filled syringe, remove the safety needle, replace it with a smaller gauge needle, and inject himself with the fentanyl. Beumel would then reattach the original safety needle, fill the fentanyl-marked syringe with saline solution, and place the syringe back on the cart. The nurse would then unknowingly inject the patient with saline solution, instead of fentanyl, from the used syringe. The saline solution (marked as fentanyl) was injected into an access port on the intravenous ("IV") tubing of a patient, not directly into the skin.

At the time Beumel diverted fentanyl intended for patients, he was infected with Hepatitis C ("HCV"), a transmittable virus with no known vaccine that infects the bloodstream and can damage and destroy the liver. Beumel did not know at the time that he was infected with HCV, and it is unknown exactly when or how he was infected.

Between 2007 and 2008, three Mayo Clinic patients were identified as having contracted HCV following treatment procedures at that medical facility.

After an extensive investigation, healthcare investigators narrowed the cause of these infections to contamination of syringes through the diversion of fentanyl by 1 of the 21 healthcare employees assigned to the Interventional Radiology Department at the Mayo Clinic. Twenty of those employees tested negative for HCV. After initially declining to be tested, Beumel submitted and tested positive for the same unique strand of HCV found in the three infected patients. Two more patients were subsequently identified as having been infected with the same strand of HCV. The latest infection occurred on or about November 21, 2008.

After several interviews with the healthcare investigators, Beumel admitted that he had been diverting fentanyl for personal use. Beumel further admitted that, sometime in late 2007, he heard a discussion about patients infected with HCV, and from then on was "very careful" not to swap used syringes for new syringes containing fentanyl. Beumel did not think that the syringes he was using would be contaminated because they were used to inject fentanyl into the IV tubing, not directly into the patient, and because he was changing the needles.

Investigation also revealed that in 2004, before joining the Mayo Clinic and while working for another hospital, Beumel had been caught diverting fentanyl and sent to substance abuse treatment. As part of his treatment, Beumel was specifically informed about the risk of exposure to HCV from injections.

4

Beumel's drug abuse counseling and monitoring continued through April 2007, long past the date he began stealing fentanyl from the Mayo Clinic.

**B.    Beumel's Victims**

Five patients were identified who contracted HCV from Beumel's use of the syringes.  One patient experienced liver damage caused by the HCV and subsequently died from other illnesses.  Another patient victim successfully eradicated his HCV by undergoing a year of aggressive and painful treatment.  However, that patient victim was infected with the HCV while being treated for multiple myeloma and one week prior to receiving a high dose of chemotherapy that essentially destroyed his immune system.  Though this patient was able to eradicate the HCV, having the infection while his immune system was compromised created a substantial risk of death.

Two other patient victims continued suffering from their HCV infections at the time of Beumel's sentencing and could not undergo treatment due to their advanced age and other health problems.  They both face protracted impairment of the liver as a result of the HCV.

Beumel's fifth victim contracted HCV during a follow-up procedure for his successful liver transplant.  Although his HCV was aggressively treated, the treatment negatively impacted his overall health and was discontinued without

5

success.  The HCV damaged the patient's new liver and, after three years of fighting the disease, he died from complications related to his HCV.

## C.    Presentence Investigation Report

After Beumel pled guilty to each of the 10 charges in the indictment, a probation officer compiled the Presentence Investigation Report ("PSI") and calculated Beumel's guidelines range based on his most serious offense—product tampering resulting in death, in violation of 18 U.S.C. § 1365(a)(2) (Count 3).

The probation officer assigned Beumel a base offense level of 38, pursuant to U.S.S.G. § 2N1.1 (cross-referencing U.S.S.G. § 2A1.2, the guideline for second-degree murder) because Beumel's offense resulted in death that did not qualify as first-degree murder.  Two levels were added under U.S.S.G. § 3A1.1(b)(1) because Beumel knew or should have known that his victim was vulnerable, and another two levels under U.S.S.G. § 3B1.3 because Beumel abused his position of trust. After a two-level reduction for acceptance of responsibility, Beumel's total offense level became 40, which, combined with a criminal history category of I, yielded a guidelines range of 292 to 365 months in prison.  There was no statutory minimum sentence for any of Beumel's offenses.  The statutory maximum sentences were as follows: (1) four years for each of the five 21 U.S.C. § 843(a)(3) counts (fraudulent acquisition of fentanyl); (2) twenty years for each of the four 18 U.S.C. § 1365(a)(3) counts (product tampering resulting in serious bodily injury); and (3)

6

life imprisonment for the one 18 U.S.C. § 1365(a)(2) count (product tampering resulting in death).

Beumel did not file any relevant objections to the PSI.[1]  He did, however, submit a sentencing memorandum, arguing that, because he was not aware of his HCV infection and did not intend to cause serious bodily injury or death, his actions were more akin to manslaughter (criminal negligence) than second-degree murder (reckless disregard of risk of death), and, thus, the Guidelines overstated the severity of his offense.  Beumel also requested that the district court sentence him to "at least twenty years [240 months], but not above the calculated guideline range."  Beumel stated that such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing.

D.    Sentencing Hearing

At the sentencing hearing, the government introduced statements from some of Beumel's victims and their family members, describing the devastating effect of the HCV infections caused by Beumel.  For example, one of the surviving victims explained how his HCV infection caused intense physical and mental suffering, put great strain on his marriage, and ruined his career.  The daughter of another victim, one who had died from the HCV, described in detail the long and painful deterioration of her father's health due to the virus, and the continuing mental

---

[1]Beumel only objected to the 2-level increase under U.S.S.G. § 3B1.3 for abusing a position of trust, but he does not challenge this increase on appeal.

7

anguish that his sickness and death caused his family. Both victims asked the district court to sentence Beumel to life imprisonment.

Beumel, in turn, presented the testimony of his mother and sister, who stated that Beumel had been a wonderful father and son, and a good person in general, and that he deeply regretted his actions and accepted full responsibility. Beumel himself took the stand, expressed remorse for his crimes, and apologized to the victims and everyone else affected by his offenses. Beumel agreed that he deserved "to go to prison for a long, long time."

In closing, Beumel's defense counsel emphasized the difference between murder and manslaughter, asserted that Beumel never intended to hurt anyone, and argued that his offense "was somewhere between homicide . . . and manslaughter, because of the peculiarities of the statute," and "that is one reason alone to exercise some degree of mercy." Defense counsel also argued that Beumel was a hard-working individual and a good father, with "but a single vice" of drug addiction, and that Beumel had a low chance of recidivism. Defense counsel conceded, however, that Beumel's offense was "a horror and in need of a large sentence . . . not so much for specific deterrence but for general deterrence."

The government recommended a sentence of 360 months in prison. It explained that, but for Beumel's guilty plea and acceptance of responsibility, a life sentence would have been appropriate.

## E.    District Court's Sentence

The district court followed the government's recommendation and imposed a total sentence of 360 months' imprisonment, to be followed by 3 years of supervised release. In addressing the 18 U.S.C. § 3553(a) sentencing factors, the district court stated:

> The first [relevant § 3553(a) factor] is the nature and the circumstances of the offense, and I'm not sure how much more serious we can get. We have an individual stealing pain medication from a patient undergoing an invasive procedure. Worse yet, the person is doing it in such a way that it subjects the patient to the risk of contracting any number of diseases, including one that could and here did result in death.
>
> I think the only thing that could make it more serious was, Mr. Beumel, if you had done this knowing for sure that you were infected. So in the scheme of offenses, this is a very, very—I can't put enough verys in there—serious offense.

The district court then addressed Beumel's history and characteristics, acknowledging that he had "led a good life"; had been a good son, father, and husband; had raised a family responsibly; had kept a good job; and had done "so many very, very good things." The district court opined that it was "tragic that [Beumel] allowed all of that to be thrown away and that [he] did so even though [he was] given the opportunity for help."

After briefly summarizing the other § 3553(a) factors, the district court further explained the sentence:

9

I recognize that that is a sentence that may very well be tantamount to a life sentence, but when I consider all of the circumstances of the offense, the significant period of time over which it occurred, the pain and suffering endured by so many as a result of [Beumel's] actions, I simply can't find any lesser sentence to be a sufficient sentence.

I know that there are some in the courtroom that believe that that sentence is not a sufficient sentence. I know that there are some in this courtroom who believe that only a life sentence would be appropriate for Mr. Beumel, and I respectfully disagree with that.

A life sentence suggests that a human soul has no chance of redemption, no right to ever rejoin a civilized society. And while what Mr. Beumel did was a horrible thing that he did many times, I do not think . . . his actions warrant such a sentence.

Recognizing that the 360-month sentence was near the top of the guidelines range, the district court concluded:

[A]t the end of the day, it's a very significant offense—course of offenses that brought you here today. And as I said, I just—in looking at it every way that I could and in considering the very real fact that but for the fentanyl, I have no doubt you would never have done anything to hurt anyone but for your addiction. I recognize that.

But unfortunately you let it get too far, to the point where you did grave harm. You did deathly harm to innocent people.

When the district court asked Beumel's defense counsel if he had any objections to the 360-month sentence or the manner in which it was imposed, defense counsel responded, "[n]one other than those previously made and noted."

## II.  DISCUSSION

### A.    Standard of Review

10

We review the reasonableness of a sentence under a "deferential abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).[2]  "The review for substantive unreasonableness involves examining the totality of the circumstances, including an inquiry into whether the statutory factors in § 3553(a) support the sentence in question." United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008).[3]

We do not apply "a presumption of reasonableness" to sentences within the guidelines range, United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010), but will "ordinarily expect" a within-guideline sentence to be reasonable, and will only remand for resentencing if the district court committed a "clear error of judgment" in weighing the § 3553(a) factors. Gonzalez, 550 F.3d at 1324 (internal quotation marks omitted).  The weight given to any specific § 3553(a) factor is "committed to the sound discretion of the district court." United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) (internal quotation marks omitted).

## B.    Application of U.S.S.G. § 2N1.1

---

[2]We reject the government's argument that Beumel invited any alleged error here and that, therefore, we should not review the reasonableness of his sentence.

[3]Pursuant to § 3553(a), a district court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a)(2), which include (1) the need to reflect the seriousness of the offense, (2) promote respect for the law, (3) provide just punishment for the offense, (4) deter criminal conduct, and (5) protect the public from the defendant's further crimes. 18 U.S.C. § 3553(a)(2). Other factors to be considered in imposing a sentence include (6) the nature and circumstances of the offense, (7) the history and characteristics of the defendant, (8) the available sentences, (9) the applicable guidelines range, (10) the need to avoid unwarranted sentence disparities, and (11) the need to provide restitution to victims. Id. § 3553(a)(1), (3)–(7).

In challenging the reasonableness of his sentence, Beumel argues that the district court's application of the second-degree murder guideline (cross referenced in § 2N1.1(c)(1) and setting a base offense level of 38) resulted in an unreasonable sentence because his offense was more akin to manslaughter than second-degree murder. More precisely, Beumel does not appear to challenge § 2N1.1(c)(1) as somehow invalid, and he expressly concedes that the district court committed no procedural error in applying that guideline. Rather, Beumel contends that, because his case involved manslaughter rather than second-degree murder, his case lay outside the "heartland" of cases to which the Sentencing Commission intended § 2N1.1(c)(1) to apply.

Beumel's argument fails. Section 2N1.1(a) ordinarily provides for an offense level of 25, but the guideline also states: "If the offense resulted in death, apply § 2A1.1 (First Degree Murder) if the death was caused intentionally or knowingly, or § 2A1.2 (Second Degree Murder) in any other case." U.S.S.G. § 2N1.1(c)(1) (emphasis added). Section 2A1.2 (second degree murder) provides for a base offense level of 38.

Because § 2N1.1(c)(1) requires the application of the second-degree murder guideline in "any" case where death was not caused knowingly or intentionally, the Commission expressly did not intend § 2N1.1(c)(1) to apply only to cases akin to second-degree murder. In other words, the categorical language of § 2N1.1(c)(1)

12

makes clear that the Commission intended that provision to apply to tampering cases involving all homicides outside of first-degree murder, including manslaughter, and no authority suggests otherwise. Thus, even if Beumel's act causing death to his victim could be classified as mere manslaughter, rather than second-degree murder, this homicide is not removed from the heartland of cases covered by § 2N1.1(c)(1).

To the extent Beumel relies on the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558 (2007), that case does not support his argument. At most, Kimbrough held that a district court may vary from the applicable guidelines range based on its disagreement with the guideline in question. See Kimbrough, 552 U.S. at 108-11, 128 S. Ct. at 574-76. Nothing in Kimbrough actually requires a district court to impose such a variance. See id.; Dell v. United States, 710 F.3d 1267, 1279 (11th Cir. 2013) (stating that Kimbrough "empowered" the district courts with the discretion to vary based on their disagreement with the guidelines' crack/powder disparity, but that Kimbrough "did not command them to exercise" this discretion). And Beumel has given us no reason to question the Commission's policy of treating tampering offenses resulting in death as extremely serious crimes, akin to second-degree murder.

## C.    Section 3553(a) Factors

13

Beumel further argues that the district court unreasonably weighed the § 3553(a) factors. We disagree. The district court expressly considered Beumel's mitigating circumstances, but found that the aggravating aspects of Beumel's offense were so serious as to warrant a substantial sentence. Beumel essentially stole fentanyl from patients on multiple occasions to feed his drug addiction, forcing those patients to endure extremely painful procedures without pain medication. Furthermore, after injecting himself with the stolen fentanyl, Beumel purposefully diverted the used syringes back to the patients. Although Beumel did not know he was infected with HCV at the time, he, as a health professional, must have known that reusing syringes in this way subjected the patients to a risk of potentially serious infection. Indeed, as a result of Beumel's conduct, five patients of the Mayo Clinic were infected with HCV, which caused these patients to endure prolonged physical and mental suffering, wreaked havoc on the lives of their loved ones, and ultimately caused the death of one patient. In addition to this direct harm, Beumel must have known that his conduct could seriously damage Mayo Clinic's reputation and erode public trust in medical institutions.

In this light, the district court properly determined that Beumel's actions warranted a lengthy sentence—one that would reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter similar criminal conduct. See 18 U.S.C. § 3553(a); Clay, 483 F.3d at 743; see also United

14

States v. Overstreet, 713 F.3d 627, 638 (11th Cir. 2013) (stating that a district court is permitted to attach "great weight" to one § 3553(a) factor over others).

We acknowledge, as did the district court, that Beumel may have been a good father and husband, that he was truly remorseful for his conduct, and that he is unlikely to reoffend. But considering the far-reaching, devastating consequences of Beumel's reckless actions, and his abuse of a position of public and private trust, we cannot say that his 360-month sentence, which lay within his guidelines range, was unreasonable. Accordingly, we affirm.

**AFFIRMED.**